**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Samuel S. SMITH and Grover Lamar**
**Lee, a/k/a Poss,**
**Defendants-Appellants.**

**No. 77–5387.**

United States Court of Appeals,
Fifth Circuit.

Jan. 17, 1979.

Eugene Loftin, Jacksonville, Fla. (Court-appointed), for Lee.

James L. Harrison, Jacksonville, Fla., for Smith.

John J. Daley, Jr., Curtis Fallgatter, Asst. U. S. Attys., Jacksonville, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, GOD-BOLD and FAY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Appellants Samuel S. Smith and Grover Lamar "Poss" Lee were tried with two other defendants[1] on charges of possession with intent to distribute marijuana and with conspiracy to distribute. A jury found Smith guilty on both counts and Lee guilty only of conspiracy. Both appeal, alleging various defects in their trial. Upon consideration of these claims, we affirm Smith's conviction but reverse Lee's and remand his case for a new trial.

The conspiracy alleged in this case began in July of 1976 when Lamar Lee, an investigator for the Public Defender's office, suggested that Sheriff Leonard of Suwannee County, Florida, participate in a scheme to sell marijuana that the sheriff's office had seized incident to drug arrests.[2] Lee told Leonard that Sam Smith, a state circuit judge,[3] would issue a destruction order as a cover-up and would arrange to dispose of the marijuana. Leonard replied that he would have to think about the proposal.

Several days later Leonard contacted FBI agent Gary Ramsey,[4] who instructed him to maintain contact with Lee but not to give definite answers.[5] On about the first of August, Smith and Lee visited Leonard and asked whether he had thought about the proposal and was willing to participate. Although he showed some interest, Leonard remained noncommittal, insisting that he had to think about it. When Judge Smith approached him in the Suwannee County Court House a week later, the Sheriff reiterated his indecision.

Finally, on September 9,[6] Sheriff Leonard, pursuant to FBI instruction,[7] called Judge Smith to find out if he still wanted to do business. Smith invited Leonard to

---

1. Although five defendants were charged in the indictment, one of them, Homer Franklin Ratliff, pleaded guilty. The other two defendants at trial were Richard Eugene Bradley and Charles Fulton Ethridge. The jury acquitted Ethridge on both counts and convicted Bradley on both.

2. Leonard was about to stand for re-election. Lee, in trying to persuade him to participate, pointed out that the Sheriff would need extra money to run his campaign.

3. Smith was the senior judge of the Third Judicial Circuit.

4. He also contacted State Attorney Arthur Lawrence and an agent from the Florida Department of Law Enforcement, James Taylor.

5. Leonard had told Ramsey that he did not want to do anything until after his election. He feared that the public would view his arresting Smith as a political move.

6. Sheriff Leonard won the election of September 7, 1976.

7. The FBI tape recorded his call and the conversation between Smith and Leonard the next day.

meet with him the next day to discuss the deal. During that meeting Leonard informed Smith that he had 1,500 pounds of marijuana of which he could let 500 go—he had to burn some in order to avoid suspicion. Five days later, Lee delivered a destruction order to Leonard. The Sheriff, however, refused the order and said he would not go through with the deal.[8]

Nothing more transpired between the appellants[9] and Leonard until November 16, when the Sheriff contacted Judge Smith to say that he had "changed [his] mind." The two agreed that Leonard would deliver 1,500 pounds of marijuana to the county land fill and that Smith would handle it from there. Smith then contacted Homer Ratliff,[10] who arranged to have Richard Bradley pick up the marijuana.[11] Bradley was arrested with the marijuana on November 17. FBI agents arrested Judge Smith the next day. Within a week, Lee, Ratliff, and Charles Ethridge were arrested.

Smith and Lee now both complain that their petit jury was selected in violation of the Jury Selection and Service Act of 1968, 28 U.S.C.A. § 1861, *et seq.* They contend that an emergency shortage of jurors existed in the Middle District of Florida, and that the clerk ignored the statutory

procedure provided for such a situation. Proper consideration of this claim requires an examination of the entire jury selection procedure.

The first step of the procedure is a random drawing of names from voter registration lists, lists of actual voters, or "other lists." § 1863(b)(2). These names are then placed in a master jury wheel, which must be periodically emptied and refilled at specified intervals, not to exceed four years.[12] § 1863(b)(4). Next, the statute requires that the clerk maintain a qualified jury wheel, which shall consist of "all persons drawn from the master jury wheel who are determined to be qualified as jurors and not exempt or excused pursuant to the district court plan."[13] § 1866(a), § 1864. Finally, the clerk shall from time to time draw at random the number of names necessary to fill grand and petit jury panels. § 1866(a).

The action appellants complain of here is the Clerk's having put back into the qualified jury wheel the names of persons who had served more than two years previously and those who had been called but for some reason did not serve. This method of supplementing the wheel, they assert, violates the specific requirements of § 1866(f)[14] and thus amounts to substantial non-compliance with the Act.[15] Moreover, they contend

8. According to the testimony at trial, Lee then responded, "Well, I don't blame you, but you ought to get them all."

9. The Government, however, asserted that Smith and Lee continued conspiring. To support this contention, the prosecution offered records showing that appellants made an unusually large number of phone calls to each other between June and November.

10. Smith had first talked to Ratliff about the deal on September 8, 1976, when he mentioned that he had access to marijuana and asked if Ratliff knew anyone who could handle it. Ratliff said he did not, and Smith said he would "get back" with him. The next day Ratliff told Bradley about his conversation with the Judge. Bradley showed no interest at that time.

11. Bradley, in turn, enlisted Ethridge's help.

12. 28 U.S.C.A. § 1863(b)(4) also provides that a District Judge may order that additional names be placed in the master jury wheel from time to time as necessary.

13. The Middle District of Florida makes the determination of exemption and excusal by means of a questionnaire sent to every person whose name is drawn from the master wheel. 28 U.S.C.A. § 1864.

14. § 1866. Selection and summoning of jury panels

(f) When there is an unanticipated shortage of available petit jurors drawn from the qualified jury wheel, the court may require the marshal to summon a sufficient number of petit jurors selected at random from the voter registration lists, lists of actual voters, or other lists specified in the plan, in a manner ordered by the court consistent with sections 1861 and 1862 of this title.

15. Section 1867(a) gives a criminal defendant the right to move to dismiss the indictment or stay the proceedings against him or her on the ground of substantial failure to comply with the provisions of the Act in selecting the grand or petit jury.

that this procedure frustrates the purposes of the Act [16] by preventing a random selection of jurors.

Section 1866(f), which constitutes the basis of appellants' challenge, states that in the event of an "unanticipated shortage," the District Court *may* order the marshal to summon jurors directly from the voter registration or other appropriate lists. Thus, if a District Court faces the possibility, due to an unexpectedly large number of trials, of having no qualified jurors to serve on its juries, it may go outside the statutory process and summon jurors without placing their names in any wheel. This statute, however, does not require that the Court employ this procedure. Its use of the permissive "may" contemplates that less extreme methods not inconsistent with the statute may be used. Therefore, unless some other provision of the statute prohibits the clerk's action in this case—§ 1866(f) surely does not—appellants' claim must fail.[17]

In examining other subsections of § 1866, we find that (c),[18] which states that persons excluded on certain grounds may sit on other juries, contemplates that many persons who have been called but have not served may be called again. Moreover, subsection (e),[19] which prohibits requiring any person to serve more than 30 days within

---

16. **§ 1861. Declaration of policy**

It is the policy of the United States that all litigants in Federal Courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

17. Appellants also contend (1) that the Clerk's removing from prospective service persons who have served during the previous two years, without regard to *length* of service, violates 28 U.S.C.A. § 1866(c) and (e), and (2) that the District's method of returning excused persons to a list of prospective jurors violates § 1866(c). We, however, decline to address these claims, since appellants raise them for the first time on appeal. See *United States v. De Alba-Conrado*, 5 Cir., 1973, 481 F.2d 1266. Since appellants present only statutory claims, they are entitled to relief only if they comply with the requirements of 18 U.S.C.A § 1867(a) and (d) in seeking it.

18. **§ 1866. Selection and summoning of jury panels**

(c) Except as provided in section 1865 of this title or in any jury selection plan provision adopted pursuant to paragraph (5), (6), or (7) of section 1863(b) of this title, no person or class of persons shall be disqualified, excluded, excused, or exempt from service as jurors: *Provided*, That any person summoned for jury service may be (1) excused by the court, upon a showing of undue hardship or extreme inconvenience, for such period as the court deems necessary, at the conclusion of which such person shall be summoned again for jury service under subsections (b) and (c) of this section, or (2) excluded by the court on the ground that such person may be unable to render impartial jury service or that his service as a juror would be likely to disrupt the proceedings, or (3) excluded upon peremptory challenge as provided by law, or (4) excluded pursuant to the procedure specified by law upon a challenge by any party for good cause shown, or (5) excluded upon determination by the court that his service as a juror would be likely to threaten the secrecy of the proceedings, or otherwise adversely affect the integrity of jury deliberations. No person shall be excluded under clause (5) of this subsection unless the judge, in open court, determines that such is warranted and that exclusion of the person will not be inconsistent with sections 1861 and 1862 of this title. The number of persons excluded under clause (5) of this subsection shall not exceed one per centum of the number of persons who return executed jury qualification forms during the period, specified in the plan, between two consecutive fillings of the master jury wheel. The names of persons excluded under clause (5) of this subsection, together with detailed explanations for the exclusions, shall be forwarded immediately to the judicial council of the circuit, which shall have the power to make any appropriate order, prospective or retroactive to redress any misapplication of clause (5) of this subsection, but otherwise exclusions effectuated under such clause shall not be subject to challenge under the provisions of this title. Any person excluded from a particular jury under clause (2), (3), or (4) of this subsection shall be eligible to sit on another jury if the basis for his initial exclusion would not be relevant to his ability to serve on such other jury.

19. **§ 1866. Selection and summoning of jury panels**

(e) In any two-year period, no person shall be required to (1) serve or attend court for

any two year period,[20] recognizes that some jurors may serve more than once in four years. The fact that a person is called a little over two years after prior jury service does not, in and of itself, violate the statute. And since the inherent random nature of the selection process is not significantly affected by such an occurrence,[21] we find that the actions appellants complain of did not frustrate the purpose of the Act.[22]

Smith raises two further points,[23] both relating to his entrapment defense. First, he claims that the trial court prevented him from eliciting from FBI agent Gary Ramsey testimony through which he could demonstrate "excessive participation by the Office of the United States Attorney in setting up the criminal acts charged." The record, however, belies this contention. It reveals that although the Judge sustained

prospective service as a petit juror for a total of more than thirty days, except when necessary to complete service in a particular case, or (2) serve on more than one grand jury, or (3) serve as both a grand and petit juror.

**20.** Subsection (e) does provide that a person may serve more than 30 days if necessary to complete service in a particular case.

**21.** The panels are still selected at random from a large group of names. The procedure used here would never produce a jury like that the Court condemned in *United States v. Kennedy*, 5 Cir., 1977, 548 F.2d 608 (although Court disapproved emergency use of volunteer jurors selected from those who had just finished a term of jury service, it found that defendant had not preserved his statutory remedy. 28 U.S.C.A § 1867(a)), *cert. denied*, 434 U.S. 865, 98 S.Ct. 199, 54 L.Ed.2d 140.

**22.** Our prior opinions have emphasized that the statute provides a remedy only for "substantial" failure to comply with the provisions of the Act. *See, e. g., United States v. Evans*, 5 Cir., 1976, 526 F.2d 701, 705–06, *cert. denied*, 429 U.S. 818, 97 S.Ct. 62, 50 L.Ed.2d 78, in which we stated that:

Congress, recognizing that there would undoubtedly be error in the jury selection process that should not result in the dismissal of an indictment, left room for harmless error by providing that dismissal should lie only when there was a *substantial* failure to comply with the Act. An analysis of the question whether there has been substantial compliance with the Act requires a review of the purpose of the Act and its underlying policy. Section 1861 contains the declaration of policy:

It is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States, and shall have an obligation to serve as jurors when summoned for that purpose.

Section 1862 implements this cross-sectional policy by proscribing discrimination in the selection process:

\* \* \* \* \* \*

According to the legislative history, H.R. 1076, 90th Cong., 2d Sess., U.S.Code Cong. & Admin.News, 1968, p. 1792 the Act . . . embodies two important general principles: (1) random selection of juror names from the voter lists of the district or division in which court is held; and (2) determination of juror disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only. These principles provide the best method for obtaining jury lists that represent a cross section of the relevant community and for establishing an effective bulwark against impermissible forms of discrimination and arbitrariness.

In *United States v. Davis*, 5 Cir., 1977, 546 F.2d 583, 589, *cert. denied*, 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391, we further explained the substantial noncompliance standard, saying that

Determining the substantial compliance question requires that the alleged violations of the Act be weighed against the goals of the statute. *See, e. g., Evans, supra*, 526 F.2d at 705–06; *Armsbury, supra* [*United States v. Armsbury*, D.Or.], 408 F.Supp. [1130] at 1142. The major policy of the Act is that juries shall be "selected at random from a fair cross section of the community." 28 U.S.C. § 1861. Discrimination is prohibited in the selection process. *Id.* § 1862. Toward these ends, voter lists are the primary source of jurors' names, and the Act aims to determine disqualifications, excuses, exemptions, and exclusions based solely on objective criteria.

In both *Evans* (in which clerks used inconsistent methods of excusing and exempting jurors) and *Davis* (in which a role in the jury selection scheme had been delegated to computer personnel), the Court found no substantial deviation from the Act. Similarly, while we do not expressly approve the measures employed by the Middle District of Florida, we do *not* find a *substantial* failure to comply.

**23.** The appellants make the rest of their claims separately, and we will address them accordingly, considering Smith's first.

the Government's objection to Smith's inquiring about a particular grand jury investigation, he allowed appellant to proffer testimony for the record. Later, the Judge limited the scope of the proffer itself, but *only* after Agent Ramsey had testified that no active investigation—other than that surrounding this particular case—had focused on Judge Smith until after November 14, 1976.[24] We find no merit to this claim.

Smith next asserts that the trial judge's vague charge on entrapment did not properly instruct the jury on the burden of proof. Admitting that he did not object at trial, he presents this contention as plain error. Our duty in reviewing this complaint is to examine the challenged charge and to determine whether, when read "in the context of the full charge given the jury," it informed the jury that the government must prove beyond a reasonable doubt Smith's predisposition to commit this crime.[25] *United States v. Netterville*, 5 Cir., 1977, 553 F.2d 903, 917, *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752.

The trial judge gave the following charge:

> If the jury finds beyond a <u>reasonable doubt from the evidence in this case that the defendant, Samuel S. Smith committed either of the two acts charged but also finds that before any such offense occurred</u> the Defendant Samuel S. Smith was ready and willing to commit such offense whenever the opportunity was afforded, and that the Government Agents did no more than offer the opportunity for the commission of such offense, the jury must find that the Defendant Smith was not a victim of entrapment, . . .

Smith objects to the underlined portion and insists that the trial judge should have repeated the words "beyond a reasonable doubt" after the words "but also finds." The instruction as given, Smith argues, allowed the jurors to apply any standard of proof they desired to the entrapment issue.

We cannot agree. Immediately after the challenged instruction quoted above, the District Judge added the following further explanation:

> On the other hand, if the evidence in the case should leave the jury with a reasonable doubt as to whether or not the Defendant Smith before any acts of inducement by agents of the Government had the intent to commit an offense charged against him in this case and did so only because he was induced or persuaded by some officer or agent of the government, then it is your duty to acquit him of any such offense.

This charge clearly tells the jury that unless the Government proves predisposition beyond a reasonable doubt, Smith must be acquitted.[26]

---

24. Pages 2594 and 2595 contain the following testimony:

> Mr. Dittmar: Well on September 9th were you working on an investigation of any other cases involving Defendant Smith?
> Mr. Ramsey: No, sir.
>
> \* \* \* \* \* \*
>
> Mr. Dittmar: Were you involved in an FBI investigation of other charges against him?
> Mr. Ramsey: Other charges, yes, sir.
> Mr. Dittmar: On November 14th?
> Mr. Ramsey: Yes, sir, there had been other allegations at that time, yes, sir.
> Mr. Dittmar: When did that come up?
> Mr. Ramsey: I'm not real sure. I can't—I couldn't pin it down.
> Mr. Dittmar: Sometime between September 9 and November 14th?
> Mr. Ramsey: The case was opened on July 27th. Now, I can't pin it down to a date of when other allegations came up during this

case, but it was sometime after July 27th there was additional things, yes, sir.

> Mr. Dittmar: Well, did that become an active investigation as far as you were concerned between July 27 and November 14?
> Mr. Ramsey: Not actively, no, not until after the 14th.

25. Smith correctly points out that once a defendant has raised an entrapment issue, the burden falls upon the government to establish beyond a reasonable doubt that the accused was not entrapped into the commission of the offense. *United States v. Benavidez*, 5 Cir., 1977, 558 F.2d 308, 310.

26. We think that the two quoted portions of the Court's charge instructed the jury as clearly as did the instruction in *Notaro v. United States*, 9 Cir., 1966, 363 F.2d 169, 173, which the appellant holds out as an example:

> If, then, the jury should find beyond a reasonable doubt from the evidence in the case that

In addition, during the entire charge, the District Judge repeatedly emphasized that the Government bore the burden of proving every element of its case beyond a reasonable doubt. We, therefore, find—especially in the face of appellant's burden of proving plain error, F.R.Crim.P. 52(b) [27]—that all of the instructions on entrapment and burden of proof,[28] read as a whole, sufficiently informed the jury of how to weigh the evidence and apply the burden of proof.[29] Finding no merit, then, in any of Judge Smith's claims, we affirm his conviction.

Turning next to Lee's claims, we first consider his dual challenge to the following jury instruction:

> before anything at all occurred respecting the alleged offense involved in this case, the accused was ready and willing to commit crimes such as charged in the indictment, whenever opportunity was offered and that the Government agents did no more than offer the opportunity, the accused is not entitled to the defense of unlawful entrapment.

See, United States v. Harrell, 5 Cir., 1970, 436 F.2d 606, 612 (although reversal of the conviction was not based on appellant's untimely challenge to the Court's charge on entrapment, on remand trial court should follow Notaro standards in fashioning the instruction), cert. denied, 1972, 409 U.S. 846, 93 S.Ct. 49, 34 L.Ed.2d 86.

Although the Notaro court approved the above-quoted instruction, it condemned the following portion:

> On the other hand, if the jury should find from the evidence in the case that the accused had no previous intent or purpose to commit any offense of the character here charged, and did so only because he was induced or persuaded by some agent of the Government, then the defense of unlawful entrapment is a good defense and a jury should acquit the defendant.

The Court explained that the words "on the other hand," "absent enlightenment as to the burden of proof," were likely to have created the impression that defendant bore the burden of proving the positive elements of his defense. 363 F.2d at 176. Further, the words "should find from the evidence," the Court found, improperly required "a definite, conclusive determination of disputed factual issues . . . as a condition to acquittal." Id. The burden of proof had unquestionably been shifted in the second instruction.

In contrast, the emphasis of the second instruction in this case is that the Government must prove beyond a reasonable doubt Smith's intent to commit the crime absent official in-

The defendant Samuel S. Smith has testified that in his dealings with Sheriff Leonard and with the defendant Grover Lamar Lee, he never intended to enter an agreement which had as its objective the distribution of marijuana. If you find from all the evidence in the case that a reasonable doubt exists as to defendant Smith's or defendant Lee's intention to enter into an agreement with each other for the purpose of distributing marijuana, you must find all defendants not guilty of the conspiracy charged in Case No. 77–14. The reason for this is that in the event a reasonable doubt exists as to whether or not defendants Smith and Lee actually intended to enter into a criminal conspir-

ducement. It does not place upon Smith a burden of affirmatively showing entrapment.

27. See United States v. Roger, 5 Cir., 1972, 465 F.2d 996, 997, cert. denied, 409 U.S. 1047, 93 S.Ct. 517, 34 L.Ed.2d 498.

28. The District Judge also gave the following instructions regarding burden of proof:

> The following are the essential elements which must be proved beyond a reasonable doubt in order to justify a conviction under this Statute. . . .
>
> \*   \*   \*   \*   \*   \*
>
> You, of course, may not find any Defendant guilty as an aider and abettor unless you find beyond a reasonable doubt that every element of the offense as defined in these Instructions was committed by some person or persons and that the Defendant willfully and knowingly participated in its commission.
>
> \*   \*   \*   \*   \*   \*
>
> The Defendant [Smith] has entered a plea of not guilty to each Indictment. The effect of that plea of not guilty is to deny every material allegation of the Indictment and put on the Government the burden of proving each material allegation of the Indictment beyond and to the exclusion of every reasonable doubt.

29. United States v. Harrell, supra, cited by appellant, does not require a different result. The only precedent it offers relevant to this case is that a timely objection to an entrapment charge that lacks instruction on the burden of proof requires reversal. Because the Court pretermitted the question whether the defective charge constituted plain error, see note 26, supra, it did not quote the instruction. Thus, the case offers no model against which we can judge the sufficiency of the presently challenged charge.

acy to distribute marijuana, the government will have failed in its proof of the particular conspiracy alleged in the indictment. . . .

■ Lee first complains that this is the kind of "all or nothing" charge condemned by the Second Circuit [30] in *United States v. Kelly,* 2 Cir., 1965, 349 F.2d 720,[31] *cert. denied,* 1966, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544, and subsequent cases.[32] More specifically, he insists that the instruction "informs the jury that [he] must be found guilty before *any* of the other defendants can be found guilty." If the jury followed the Court's direction, Lee reasons, it may have found him guilty merely out of reluctance to acquit Smith, against whom the evidence was very strong. Agreeing that the charge improperly directed the jury to consider Smith and Lee together rather than individually, we reverse Lee's conviction.

We have often insisted that proof of guilt on a conspiracy charge must remain " 'individual and personal' and that the government [must] show beyond a reasonable doubt that each and every alleged member of the conspiracy had the deliberate, knowing, specific intent to join . . . ." *United States v. Morado,* 5 Cir., 1972, 454 F.2d 167, 175, *cert. denied,* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116. The charge in this case created a real danger that the jury would not engage in such individual deliber-

**30.** Because we have no precedent from Fifth Circuit decisions, we refer to several Second Circuit cases as models for analyzing this particular claim. Only one Fifth Circuit case has addressed an alleged "all or nothing" charge. *United States v. Crockett,* 5 Cir., 1975, 514 F.2d 64. In *Crockett* the Court found that the concurrent sentence doctrine precluded consideration of the merits of that claim.

**31.** In *Kelly,* the Second Circuit emphasized that the jury must clearly understand the difference—when one exists—between the evidence against individual defendants. 349 F.2d at 757. The trial court had given the following instruction:

> In analyzing the evidence you must determine whether there was a single, continuing overall conspiracy or separate, independent conspiracies with separate and distinct groups involved, with no overall central purpose. If you find separate conspiracies and that some of the defendants belonged to one and not to the other, then there would be no proof of the single conspiracy charged in the indictment; and in that case you must return a verdict of not guilty as to all of the defendants on the conspiracy count.

On appeal, the Second Circuit found that the trial judge, by failing to realize that the evidence would support a finding that two of the defendants had conspired but that the third had not, had "lumped them all together and [had given the condemned] 'all or nothing' charge." The Court further stated that "[t]his was the equivalent of an instruction that the jury could not acquit [the third defendant] without also acquitting [the other two]." *Id.*

The Government, arguing that *Kelly* protects only peripheral participants, contends that Lee, as a "bedrock" conspirator, does not have standing to assert this claim. We reject this contention for two reasons. First, the *Kelly* Court relied for its result on *United States v. Borelli,* 2 Cir., 1964, 336 F.2d 376, 384–86 & n.4, *cert. denied sub nom., Cinquegrano v. United States,* 1965, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555. In *Borelli,* the Court held that "where evidence is ambiguous as to the scope of the agreement made by a particular defendant and the issue has practical importance, the Court must appropriately focus the jury's attention on that issue rather than allow it to decide on an all-or-nothing basis as to all defendants." *Id.* at 386, n.4. *Borelli* did not distinguish between "bedrock" and "peripheral" conspirators as such.

Second, we find, independent of any model from the Second Circuit, that in this case, the jury's eagerness to convict Smith (who abused his position as a judge to further a criminal scheme) should not be allowed to unfairly prejudice Lee. The jury may well re-convict him on the conspiracy charge. But that conviction must rest solely upon evidence that he actually and knowingly conspired.

**32.** E. g., *United States v. Guanti,* 2 Cir., 1970, 421 F.2d 792, 800 (charge that all of defendants must be acquitted if more than one conspiracy had been proved or if a single conspiracy did not continue beyond September 30, 1959—along with additional instruction that jury could convict "some, all, or none of the defendants as members of the conspiracy"—did not constitute "all or nothing" charge), *cert. denied,* 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64; *United States v. Calabro,* 2 Cir., 1971, 449 F.2d 885 (trial court, by instructing jury to consider proof against each defendant individually and explaining evidence upon which Government relied to connect each defendant to conspiracy, complied with *Borelli* and *Kelly* ), *cert. denied,* 1972, 404 U.S. 1047, 92 S.Ct. 728, 30 L.Ed.2d 735.

ation. By linking Lee inextricably to Smith, the District Court essentially ensured Lee's conviction.

Indisputably, the District Judge acted with the laudable motive of requiring the Government to prove the specific allegations in the indictment.[33] By "particular conspiracy alleged," he meant a conspiracy beginning in July, 1976, and *continuing* through November 16, 1976.[34] He did not, however, clearly state this. Instead, he allowed the jury to conclude that the "particular conspiracy" was any scheme to distribute marijuana. Armed with this instruction and ample evidence that Judge Smith had conspired with others, the jury was unlikely to find Lee not guilty, knowing that acquittal would necessitate disregarding all other evidence of conspiracy.

The Court should have explained that the Government had to prove two distinct things: (1) that a conspiracy began in late July (and continued through November 16, 1976) and (2) that as part of the common scheme, each defendant knowingly became part of and participated in the conspiracy.[35] As an immediate supplement[36] to this instruction, the Court should have emphasized that the jury should consider each defendant separately, examining *only* the evidence relating to each individually.

In his second challenge to this same instruction, appellant assigns plain error[37] to the trial court's failure specifically to instruct that the Government must prove the single alleged conspiracy. Citing F.R. Crim.P. 8—which prohibits the Government from charging more than one offense per count of an indictment—he argues that the

**33.** The District Judge, overruling Lee's objection to the challenged instruction, explained at page 3910 of the trial transcript that the purpose of the charge was to compel the government *to prove what it had pleaded.*

**34.** An instruction that the Government must prove only one conspiracy was not absolutely necessary in this case. *See* note 40, *infra.* An explanation that the Government must have shown *a* conspiracy of the alleged duration would have sufficed.

**35.** *See United States v. Bynum,* 2 Cir., 1973, 485 F.2d 490, 497, *vacated on other grounds,* 1974, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209, *jdgmt. reinstated,* 1975, 2 Cir., 513 F.2d 533, *cert. denied,* 423 U.S. 952, 96 S.Ct. 357, 46 L.Ed.2d 277, in which the Court gave the following instruction among others:

If you decide that the charged conspiracy existed between any of the defendants, you must then decide as to each defendant individually whether he or she joined the conspiracy with knowledge of either one or both of its purposes as alleged in the indictment.

**36.** The Government asserts that the District Court gave such a supplemental instruction when it charged the jury that

[i]t is your duty to give separate personal consideration to the case of each defendant. When you do so, you should analyze what the evidence in the case shows with respect to that individual, leaving out of your consideration entirely any evidence admitted solely against any other Defendant. Each Defendant is entitled to have his case determined from evidence as to his own acts and statements and conduct and any other evidence in the case which may be applicable to him.

Transc. p. 4872. This charge, however, was given before the District Judge read the conspiracy count of the indictment. Thirteen pages later, the Court gave the instruction Lee challenges here. *Transc.* pp. 4885–86.

We find that, although the Court's charge must be read as a whole, the portion regarding individual consideration was too remote from the "all or nothing" instruction to prevent potential jury confusion.

The Government further contends that the District Court delivered the equivalent of *Guanti*'s *supra,* "some, all, or none" instruction, *see* note 32, *supra,* when it told the jury that

[y]ou must evaluate the evidence as to each offense charged and render a separate verdict on each alleged offense as to each individual Defendant. Your verdict on one offense charged need not control your verdict on the *other offense charged.* Thus, the fact that you may find all or one of the Defendants guilty or not guilty of one of the offenses charged should not control your verdict as to the other offense charged.

We cannot agree. The instruction merely informed the jury that it could convict a particular defendant of the substantive offense while acquitting him of conspiracy, and vice versa.

**37.** Although appellant objected strenuously to the "all or nothing" aspect of the charge, he did not request an instruction on *proof of a single conspiracy.* This particular portion forms the target of his attack on appeal, because, as he says, it "is the only charge that makes any effort to instruct the jury on the issue of single or multiple conspiracies."

evidence permitted an inference that there were two conspiracies, the first ending September 15, 1976,[38] the second including the November 16 delivery. Such a variance between allegation and proof, he asserts, would probably have led a properly instructed jury to find the indictment defective.

Since we are reversing Lee's conviction on the "all or nothing" aspect of this charge, we will not consider specifically whether, on the facts of this case, failure clearly to charge on single or multiple conspiracies would require reversal absent objection.[39] We do, however, emphasize the importance of carefully phrasing each instruction to minimize the possible confusion to the jury.[40]

We similarly decline to consider Lee's last contention, that the District Court erred in denying his motions to sever. Since we fully affirm Smith's conviction, Lee will stand alone at his retrial. Thus, his allegations of the prejudice he suffered from being tried with Smith will hold no significance.

AFFIRMED IN PART; REVERSED IN PART.

---

**38.** According to the testimony at trial, on September 15 Lee had his last encounter with Leonard. *See* note 8, *supra.*

**39.** *See United States v. Harrell,* footnoted *supra.*

**40.** Such an instruction might have clarified the portion we have condemned today as an "all or nothing" charge. We have often held, however, that the Government may present evidence of more than one conspiracy as long as it accurately proves the conspiracy it has alleged in the indictment. *See, e. g., United States v. Ashley,* 5 Cir., 1977, 555 F.2d 462, 468, *cert. denied,* 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 210.

Clearly, then, the significant issue here would be whether the Government had proved that a conspiracy continued as alleged.