UNITED STATES of America,
Plaintiff-Appellee,

v.

Wilson Hopson IRVIN,
Defendant-Appellant.

No. 85–8370.

United States Court of Appeals,
Eleventh Circuit.

April 28, 1986.

Peter Zack Geer, Albany, Ga., for defendant-appellant.

Edgar W. Ennis, Jr., Asst. U.S. Atty., Macon, Ga., Marie E. Klimesz, Wm. Bradford Reynolds, Jessica Dunsay Silver, U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., for plaintiff-appellee.

Before GODBOLD, Chief Judge, ANDERSON, Circuit Judge, and ATKINS *, Senior District Judge.

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation

ATKINS, Senior District Judge:

Appellant, Wilson Hopson Irvin, was convicted under 18 U.S.C. § 241 of conspiracy to violate the civil rights of Jerry Johnson. Irvin seeks reversal because, after two trials, his three alleged co-conspirators were acquitted. He urges a violation of the teaching of *Herman v. United States*, 289 F.2d 362 (5th Cir.), *cert. denied*, 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961).[1] We affirm on the authority of *United States v. Espinosa-Cerpa*, 630 F.2d 328 (5th Cir. 1980).

## I. FACTS AND PROCEDURAL HISTORY

Irvin does not challenge the sufficiency of the evidence to support conviction. Nevertheless, a summary of the facts is essential to an understanding and resolution of this appeal. There was evidence adduced at trial from which the jury could infer the following:

Lee Warren (Gator) Johnson, Sr., was sheriff of Baker County, Georgia from the late 1950's until he retired in 1977. Lee Warren (Scroot) Johnson, Jr., was elected sheriff following his father's retirement. In May 1982, Scroot Johnson was convicted in federal court of income tax evasion and resigned as sheriff. Grace Rogers, the probate judge of Baker County, appointed Irvin sheriff in May 1982.

In August 1982, a special election was held. Herbert Johnson, Scroot's brother, ran against Sheriff Irvin and lost. In November 1982, an article appeared in the Camilla Enterprise relating to the legal qualifications for sheriff in the State of Georgia, regarding elections being held in the adjoining county. Herbert Johnson and his wife took the article to Judge Rogers and questioned Irvin's qualifications. Herbert was speaking in a loud voice because Judge Rogers has a hearing problem. Sheriff Irvin had read the article that morning, and when he saw Herbert heading toward Judge Rogers' office with a copy of the paper, he grabbed a copy of the Georgia law containing the qualifications and followed Herbert into the Judge's office. He threw the book on the Judge's desk and stated that he was qualified to be sheriff. He appeared to be upset.

Jerry Johnson, brother of Scroot and Herbert, owned a liquor store on State Highway 91 in Newton called Jerry's Package Store. Jerry and one of his employees, Joel Kelly, were active in Herbert's 1982 campaign for sheriff. Directly across the road from Jerry's Package Store is the Sundown Package Store owned by Horace Musgrove, who was active in Sheriff Irvin's campaign.

Joel Kelly was also involved in the campaign of Mary Ann Gray, the wife of defendant Dan Mark Gray, when she ran for tax collector. Kelly, who is black, told Dan Gray's brother Ray that if Dan did not stop associating himself with Irvin's activities at "the clubs," blacks would not vote for Mary Ann.

On November 12, 1982, Joel Kelly was driving home from work at Jerry's when he was pulled over by Sheriff Irvin and Deputy Dan Mark Gray. Both officers approached Kelly at the same time and asked him to get out of his car. Gray grabbed Kelly by his shirt and began cursing and hitting him on the back of his head. While Gray was hitting Kelly, Irvin searched Kelly's car and said that he hoped he'd find a gun there. When Irvin found a gun belonging to Kelly's cousin in the car, Gray stopped hitting Kelly and put him in the back seat of the sheriff's car.

En route to the jail, Irvin told Kelly that he had heard that Kelly had been talking about him. Kelly was not given any other explanation for being stopped, roughed up and put into the sheriff's car. When he was released, he was not required to post a bond and was not given a ticket or citation. No charges were ever filed concerning possession of the gun found in Kelly's car. As Kelly was leaving the jail, Irvin told him that he (Irvin) was sheriff now, not Gator

---

1. While Irvin lists six issues in the Statement of Issues in his brief, he argues only one issue— whether acquittal of his alleged co-conspirators compels reversal.

Johnson. Gray told him that if he (Gray) heard anything about what had happened that night, Kelly would not hear the last of him.

On November 19, 1982, Kelly was driving Jerry's black Ford pickup truck to Camilla to make a delivery of beer. On the way back from Camilla to the liquor store, Kelly noticed two vehicles parked by the side of the road past the Flint River Bridge on Highway 37. Kelly did not recognize the cars as Baker County Sheriff vehicles, nor did he realize that it was a roadblock. As he neared the cars, he recognized Dan Gray. When Kelly did not stop, Gray started cursing and yelling to him to stop. Remembering what had happened to him the week before, Kelly was afraid to stop and so continued on at a normal rate of speed back to the liquor store.

Sheriff Irvin pulled into the parking lot and ran into the liquor store. After some initial confusion, Jerry told Irvin that Kelly had been driving the truck. Irvin asked Jerry to call Kelly out of the storeroom. When Kelly came out, Irvin told Kelly to come with him. Kelly asked why and Irvin said he had run a stop sign. Irvin then drew his gun and pointed it at Kelly. Jerry, who was frightened, told Kelly to go with Irvin. As they were leaving, Irvin turned around and said, "I'm going to show you son-of-a-bitches who's qualified to be sheriff."

As Kelly neared the sheriff's car, Irvin told Deputy Dan Mark Gray to "[p]ut it on the son of a bitch." Gray then hit Kelly across the eye with a flashlight. Kelly had done nothing to resist arrest.

Deputy Rehobie Hawkins put Kelly in the sheriff's department car and took him to the jail. From there, Hawkins radioed Irvin that Kelly wanted to see a doctor, and Irvin authorized Hawkins to take Kelly to the hospital.

At the hospital, Kelly was examined by Dr. Abelardo Magat. Dr. Magat testified that Kelly had a contusive type of laceration caused by a blunt instrument. The cut over Kelly's eye was deep enough to expose the bone, and there was a small crack in the bone in the area of the laceration. Kelly received five stitches, and his head was bandaged.

No charges were ever filed by the sheriff's department concerning the events of November 19. Early in the following week, Kelly met with FBI Agent Michael Bowie in Albany, after an eyewitness to the incident contacted Bowie. One Saturday evening thereafter, Irvin came by the liquor store after closing hours, grabbed Kelly by his shirt and called him the "FBI man."

Mallory Strawder who operates a lounge in Newton was visited by Irvin several times following the 1982 election, and Irvin repeatedly told him to buy his liquor from Horace Musgrove's liquor store, the Sundown, rather than from Jerry Johnson. Irvin was accompanied by Deputy Dan Gray on one occasion and by Deputy Philip Sheffield on another. On one occasion, Irvin asked Strawder to get into his car, and, as Strawder opened the car door, Irvin pulled off so that Strawder fell into the car. Irvin struck Strawder across the chest with a gun and called him a "smart nigger." Irvin drove about a quarter mile from Strawder's lounge and continued verbally to abuse him and hit him on the side of the head with the gun. He asked Strawder why he wasn't going to the Sundown liquor store as he had been told, and finally he returned Strawder to the lounge. Strawder contacted the FBI the next day.

On another occasion, Irvin came into the lounge, searched it and Strawder's truck and took him to jail, purportedly for possession of a marijuana cigarette. Irvin told Strawder not to use Jerry's liquor because it "caused" him money, and he would not allow it. Strawder was not charged with any crime as a result of that incident nor has he ever been charged with any crime involving his business.

Sara Mitchell testified that, in the fall of 1982, she and some friends bought some liquor from Jerry's and were heading back to Camilla when they were stopped by two deputy sheriffs from Baker County. One

of the deputies was white, the other black. Mitchell stated that, after the driver of the car was asked to step out and to the rear of the car, the white deputy asked her and the remaining occupants of the car where they had bought their liquor. The deputy told them that from then on it would be a better idea if they bought their liquor from the store across the street from Jerry's. Mitchell identified the white deputy as Dan Gray. The driver of the car was not given a ticket as a result of the stop.

On November 19, 1982, Jesse Strum went to Jerry's Package Store and bought five or six pints of whiskey. On the way back to Mitchell County, Strum was stopped by a white officer who told him he had seen Strum at Jerry's and that, if he were Strum, he would not go back to Jerry's, but would go to the Sundown instead. The officer told him he could go and did not give him a ticket. Strum returned to Jerry's that day because he owed Jerry a little money and told Jerry he would not be coming back. He has not gone to Jerry's since then because the "law" told him not to go.

Joe Thomas, a resident of Mitchell County, went to Jerry's on November 19, 1982, and bought a fifth of liquor. On his way home, he was stopped by Deputy Hawkins. Hawkins asked Thomas how much liquor he had with him and took Thomas' driver's license back to the patrol car. When Hawkins returned to Thomas' car, he told Thomas that he was letting him go and that next time he shouldn't buy liquor from Jerry, or Hawkins would "make a case against him." Thomas was not given a ticket. After hearing about the beating of Joel Kelly that same night, Thomas told Jerry about the stop.

On that same night Carl Hooker, a member of the United States Navy who was visiting his sister, was pulled over by a patrol car after leaving Jerry's liquor store. A white officer made him get out and step to the rear of the car. Hooker showed the officer his driver's license, and the officer told him he had run a stop sign. Hooker said that he had not run the sign. When the officer asked Hooker why he had gone to Jerry's, Hooker replied that it was easier to get to Jerry's. The officer said that he should go to the store across the street, and they would treat him just as nice.

Hooker than asked if the officer was going to give him a ticket. The officer asked whether Hooker was "getting smart" with him and began hitting a flashlight across the palm of his (the officer's) hand. Hooker said that he was not being smart but wanted to know why he was being detained. The officer told Hooker that he was letting him go but the next time he should buy his liquor across the street. Hooker was not given a ticket. When he returned to his sister's house, he called Jerry's liquor store and reported what had happened.

On November 20, 1982, Leroy Harper drove from Mitchell County to Jerry's liquor store and purchased three cases of beer. On his way back to Mitchell County, he was stopped by two deputies, one of whom he identified as Gray, who asked him to open his trunk. When they asked him where he had bought his liquor, he told them "both places." He was then told that he could go. He was not told why he had been stopped nor was he given a ticket.

On November 20, 1982, when Leroy Harper left his store, Jerry Johnson had seen Deputies Gray and Sheffield follow him at a high rate of speed. Jerry got into his truck and followed them to the intersection where Harper was stopped. That afternoon, Jerry went to the jail and told Irvin that he could not make a living with deputies stopping his customers. Irvin told Jerry that he had nothing against him, but he was tired of Herbert and Jerry's father questioning his qualifications to be sheriff. Irvin told Jerry that if he would talk to Herbert, he (Irvin) would "call the dogs off." Jerry agreed to talk to Herbert. In December 1982, Jerry's car was impounded with a quantity of liquor in the trunk. When Jerry went down to the jail to see about getting his car back, Irvin told him

that he realized Jerry could not control Herbert and that he could have his car and liquor back and Irvin would not bother him anymore.

In the spring before the 1984 election, in which Jerry's brother Herbert was again running against Irvin, Irvin pulled Jerry over and asked him to witness a conversation with Wade Hudson, one of Jerry's employees. Afterwards, Irvin told Jerry that Kelly was going to pay a "little traffic ticket" and that he (Irvin) was not "going to lose the election by the help of a liquor store." He said that if he heard that Jerry was participating in the campaign, he would put a deputy across the street and "stop every son-of-a-bitch that left." Jerry told Irvin that he was not going to be active in the campaign but that he would vote for Herbert. Irvin said, "If you do that, you can unlock the locked gate."

Jerry then bought a small tape recorder, and the following week, when he and Irvin had a conversation at a gas station, he recorded the conversation without Irvin's knowledge. On the tape, Jerry asked Irvin whether the deal they had spoken about in the prior conversation was still on, in light of some recent events which he feared might have been interpreted by Irvin as a violation of his agreement not to get involved in the campaign. Jerry reiterated his promise not to have anything to do with the campaign other than to vote for his brother Herbert. Irvin replied, "As long as you do that, you can open the goddam front door and pour it out. I don't give a fuck." At the end of the conversation, Irvin says on the tape, "I don't want to get in no trap now. You ain't got no—." Jerry testified that at this point Irvin had patted him down to see if he had a tape recorder on, but did not find it. Jerry's answer on the tape is, "I ain't got nothing but cigarettes."

On September 26, 1983, a federal grand jury in the Middle District of Georgia returned a three-count indictment charging appellant Wilson Hopson Irvin and others with violations of 18 U.S.C. §§ 241, 242,

and 2. Count one charged that Irvin, then sheriff of Baker County, Georgia, and three of his deputies, Dan Mark Gray, Philip Sheffield, and Rehobie Hawkins, willfully and knowingly conspired to injure, oppress, threaten and intimidate Jerry Johnson in the free exercise and enjoyment of his right not to be deprived of property without due process of law, in violation of 18 U.S.C. § 241. Count one charged that the purpose of the conspiracy was unlawfully to intimidate persons not to do business with a liquor store owned and operated by Jerry Johnson. Seven overt acts were alleged in furtherance of the conspiracy.

Two of the overt acts alleged in count one also formed the basis for counts two and three of the indictment. Count two charged appellant Irvin and Dan Mark Gray with aiding and abetting each other in assaulting Joel Kelly, an employee of Jerry Johnson, on or about November 12, 1982, under color of law, thereby depriving him of his liberty without due process of law, in violation of 18 U.S.C. §§ 242 and 2. Count three charged Irvin and Dan Mark Gray with a similar violation in connection with an incident on November 19, 1982.

All of the defendants charged in the indictment were tried on April 2–5, 1984. Defendants Philip Sheffield and Rehobie Hawkins were acquitted on count one, the conspiracy count. The jury was unable to reach a verdict on count one as to Irvin and defendant Dan Mark Gray. The jury acquitted Irvin and Gray on the two substantive counts of violating 18 U.S.C. § 242.

Irvin and Dan Mark Gray were retried on count one of the indictment on April 8–12, 1985. On April 12, 1985, the jury acquitted Dan Mark Gray but found Irvin guilty. On April 30, 1985, Irvin was sentenced to five years probation. This appeal followed.

## II. STANDARD OF REVIEW

The district court's denial of Irvin's motion for judgment of acquittal, based upon the acquittal of two of his alleged co-conspirators in the first trial and of the third alleged co-conspirator, in the

second trial, is subject to review for legal error. This court must also review for legal error the district court's ruling that the United States was entitled to present, as overt acts in furtherance of the conspiracy, evidence of incidents on which Irvin was acquitted of violating 18 U.S.C. § 242 in the prior trial.

■ As to Irvin's challenge to the jury instructions, the court must view the charge as a whole to determine whether it fairly and accurately stated the law.

■ The district court's granting of the United States' motion to prevent Irvin from attempting to prove that Sheffield and Hawkins were acquitted in the first trial should be upheld unless this court finds it was an abuse of discretion.

III. THE ACQUITTAL OF TWO OF DEFENDANT'S ALLEGED CO–CONSPIRATORS IN THE FIRST TRIAL, AND OF HIS REMAINING ALLEGED CO–CONSPIRATORS IN THE SECOND TRIAL DOES NOT REQUIRE REVERSAL

■ Irvin urges that the acquittal in the first trial of Rehobie Hawkins and Philip Sheffield, two of his three alleged co-conspirators, and the acquittal of Dan Mark Gray, the remaining alleged co-conspirator, in the second trial requires reversal of his conviction on the principle that the "crime of conspiracy * * * cannot be committed by a single individual acting alone." This statement accurately expresses the "traditional rule," established in *Herman v. United States*, 289 F.2d 362 (5th Cir.), *cert. denied,* 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961), where all of the acquittals occur in a single trial. However, this case is governed by *United States v. Espinosa-Cerpa*, 630 F.2d 328 (5th Cir.1980).[2] The *Espinosa-Cerpa* court refused to extend the traditional rule to a situation

where the acquittals of the defendant's alleged co-conspirators occurred in a prior trial before a different jury. Irvin's efforts to distinguish *Espinosa-Cerpa* are unpersuasive.

In *Espinosa-Cerpa*, four men, including Espinosa-Cerpa, were indicted for allegedly conspiring with each other, and with other persons unknown, to import and distribute marijuana. When Espinosa-Cerpa fled the jurisdiction prior to trial, the trial of the remaining defendants proceeded without him. All three of the alleged co-conspirators were acquitted. Espinosa-Cerpa was eventually apprehended, tried, and convicted. He appealed his conviction, claiming that the prior acquittal of the named alleged co-conspirator foreclosed his conviction for conspiracy.

The court in *Espinosa-Cerpa* refused to extend the "traditional rule" that "a single conspirator may not be convicted in the same proceeding or prosecution in which all of his alleged fellows are acquitted," to a factual setting in which the acquittals of the alleged co-conspirators occurred in a prior trial. In so holding, the panel questioned the soundness of the traditional rule. The court observed that the premise upon which the rule is based, i.e., that the acquittal of a defendant's alleged co-conspirators negates their participation in the alleged conspiracy, is at odds with the fact that acquittals may result from "compromise, confusion, mistake, leniency or other legally and logically irrelevant factors" rather than from a finding of innocence or a failure of proof by the government.

The court noted also that both the premises and the traditional rule are contrary to the principle that inconsistent jury verdicts among multiple defendants tried together on essentially the same evidence do not provide grounds for overturning an otherwise valid jury verdict which has adequate evidentiary support. The rationale of that

---

2. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), makes this decision of the Fifth Circuit binding precedent for this

court. *See also United States v. Kincade*, 714 F.2d 1064, 1065 (11th Cir.1983).

holding, established in *Dunn v. United States*, 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed.2d 356 (1932) had recently received the imprimatur of the Supreme Court in *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 475, 83 L.Ed.2d 461 (1984).

The *Espinosa-Cerpa* court concluded that, even if the traditional rule has validity, it should not be extended to prior acquittal of alleged co-conspirators. The court recognized that different evidence may have been presented in the two trials or that two juries might "quite reasonably have taken different views of the same evidence." *Espinosa-Cerpa*, 630 F.2d at 333.

In the second trial of this case on appeal, the government adduced evidence, not presented in the first trial, corroborating Kelly's testimony and rebutting Irvin's defense to Strawder's testimony.[3] These pieces of evidence were material to the conspiracy issue since they tend to prove the existence of several of the overt acts alleged in the indictment, i.e., that defendant was engaged in harassment of Jerry Johnson's customers because of Johnson's political activities. While the new evidence does not directly link the other alleged co-conspirators to the conspiracy, it corroborates the testimony of other witnesses about the scheme of harassment.

The court in *Espinosa-Cerpa* also observed that an extension of the traditional rule such as Irvin seeks here "would be blatantly inconsistent with the Supreme Court's decision in *Standefer v. [United States*, 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) ]," in which the Court rejected the applicability of nonmutual collateral estoppel to criminal cases. In *Standefer* the Supreme Court noted that, in a criminal case, the government does not have any means of seeking review of error in the trial court, which is the "prerequisite of estoppel."

Second, the *Espinosa-Cerpa* court observed that evidentiary rules, such as the exclusionary rule, might prevent the government from using certain evidence in the first trial against some defendants. Finally, the court relied upon the "important federal interest in the enforcement of the criminal law," which outweighs the concern for judicial economy upon which estoppel is based.

The court in *Espinosa-Cerpa* stated that the extension of the traditional rule to prior acquittals would operate in essentially the same manner as nonmutual collateral estoppel to bar relitigation of the fact of the previously acquitted alleged co-conspirators having engaged in a conspiracy with the defendant in the second trial. It held therefore, that "the prior acquittal of appellant's named alleged co-conspirators did not preclude his later conviction for having conspired with them."

## IV. *ESPINOSA-CERPA* IS CONTROLLING

Irvin assails the authority of *Espinosa-Cerpa* urging that (a) at best it is distinguishable or (b) at worst it is an aberration. We reject these arguments for the reasons set forth herein.

Irvin attempts to distinguish *Espinosa-Cerpa* on the basis that one of the alleged co-conspirators, Dan Mark Gray, was acquitted in the same trial in which Irvin was convicted while, in *Espinosa-Cerpa*, all of the alleged co-conspirators were acquitted

3. The first trial, the government points out, lacked medical evidence to corroborate Joel Kelly's testimony regarding Gray's attack on him with the flashlight. In the second trial, Dr. Magat, who had treated Kelly in the emergency room, testified that the wound went clear down to the bone and that the bone itself was cracked. He was of the opinion that it was more likely the blow was struck by an object such as a flashlight than by Kelly butting his head against Deputy Gray's badge, as the defense contended. Similarly, as defendant recounts in his brief, two other pieces of evidence not presented in the first trial were presented in the second: the tape recording of his conversation with Jerry Johnson and confirmation by FBI agent Bowie of his telephone conversation with Mallory Strawder.

in a prior trial. This fact, while true enough, provides no apparent reason for fashioning an exception to the rule of *Espinosa-Cerpa,* nor does Irvin suggest such a reason. So long as some of the alleged co-conspirators were acquitted in a prior trial by a different jury, the reasoning of the court in *Espinosa-Cerpa* is applicable.[4]

The fact that in *Espinosa-Cerpa* there were other, unnamed alleged co-conspirators was not a factor in that case because the court rejected, as unsupported by the evidence, the government's argument that the jury might have concluded that the convicted defendant had conspired with them, rather than the named alleged co-conspirators, 630 F.2d at 330–331 n. 2.

The court in *Espinosa-Cerpa* thus analyzed the case "as if the named alleged conspirators were the only ones with whom appellant might have conspired." *Id.* at 331 n. 2. Irvin's assertion that *Espinosa-Cerpa* can be distinguished on that basis is incorrect.

Irvin's contention that *Espinosa-Cerpa* is "bad law" because it defies the "traditional rule" of *Herman, supra,* is misplaced. It was not necessary for the court in *Espinosa-Cerpa* to overturn the traditional rule, and it did not do so. It merely refused to extend the rule to a situation not covered by the traditional rule.

## V. OTHER ERRORS LISTED BUT NOT ARGUED

As above noted, Irvin initially listed six issues in the Statement of Issues section of his brief. Summarized and clarified they involve but three additional issues.

### A. IT WAS NOT ERROR TO ALLOW THE GOVERNMENT TO PRESENT AS OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY TWO INCIDENTS ON WHICH THE DEFENDANT WAS ACQUITTED OF VIOLATING 18 U.S.C. § 242 IN THE PRIOR TRIAL

Irvin, as recited earlier in this opinion, was acquitted in the first trial on two counts of violating 18 U.S.C. § 242 in connection with the alleged beatings of Joel Kelly on November 12 and 19, 1982. The jury acquitted two of Irvin's co-defendants on the Section 241 conspiracy count but could not reach a decision concerning Irvin and Dan Mark Gray. The government decided to retry Irvin and Gray on the conspiracy count of the original indictment, and filed in the district court a notice of intention to use as evidence in the second trial, evidence concerning the apprehensions and arrests of Kelly which were the basis for the Section 242 counts in the first trial. The district court ruled that such evidence was admissible.

*United States v. Garza,* 754 F.2d 1202 (5th Cir.1985) is persuasive. Garza and co-defendant Menchaca were initially named in a fifteen count indictment which included charges alleging violations of 18 U.S.C. § 241. *Id.* at 1204. The trial jury convicted them of one Section 242 charge, acquitted them of seven other Section 242 charges, but could not reach a verdict on the conspiracy count and on four other Section 242 charges. The defendants were retried on the charge on which the first jury had been unable to reach a verdict. Six of the seven Section 242 counts on which defendants had been acquitted or granted a mistrial in the first trial were

---

**4.** The fact that the second jury acquitted Gray but convicted Irvin does not provide a basis for attacking its verdict, *Dunn,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356; Powell, 105 S.Ct. 471. As the court noted in *Dunn,* 284 U.S. at 393, 52 S.Ct. at 190; quoting from *Steckler v. United States,* 7 F.2d 59, 60 (2d Cir.1925), " '[t]he most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not

convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity.' "

The government suggests that in this case, such lenity might be explained, for example, by a desire to punish the man who ordered the beating (Irvin), rather than the man (Gray) who carried it out.

named as overt acts in furtherance of the conspiracy in the superseding indictment. Prior to the trial, the defendant Menchaca filed a motion to strike those counts on the basis of collateral estoppel. The district court overruled his contention, and the jury convicted Garza and Menchaca on the conspiracy charge as well as four Section 242 counts.

The court of appeals rejected Menchaca's collateral claim, and held:

> By returning a general verdict of not guilty on five counts and by stating it was unable to reach a verdict on the sixth, the jury did no more than announce that that it was not convinced beyond a reasonable doubt of at least one essential element of a § 242 offense. * * * For whatever reason, the jury concluded that proof was lacking that a crime was committed. 754 F.2d at 1209.

The court further observed that, since overt acts alleged in support of a conspiracy need not be crimes, *United States v. Khamis*, 674 F.2d 390, 393 (5th Cir.1982); *United States v. Willis*, 583 F.2d 203, 207 (5th Cir.1978), there was no reason why the facts of the Section 242 charges on which Menchaca was acquitted could not be later used as non-criminal overt acts in furtherance of the conspiracy.

■■■ Collateral estoppel prohibits the relitigation of any "issue of ultimate fact [that] has once been determined by a valid and final judgment." *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). Where a previous judgment of acquittal was based upon a general verdict, the court must:

> examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.

*Ashe*, 397 U.S. at 444, 90 S.Ct. at 1194. For estoppel to apply, the fact sought to be foreclosed by defendant must necessarily have been determined in his favor in the prior trial; it is not enough that the fact *may* have been determined in the former trial. *United States v. Griggs*, 735 F.2d 1318, 1326 (11th Cir.1984); *United States v. Lee*, 622 F.2d 787, 790 (5th Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1987, 68 L.Ed.2d 303 (1981). Two inquiries must be made: (1) what facts were necessarily determined in the first trial, and (2) was the government at the second trial attempting to relitigate facts necessarily established against it at the first trial? *United States v. Mock*, 604 F.2d 341, 343 (5th Cir.1979).

In Irvin's first trial, the court charged the jury that four essential elements must be proven beyond a reasonable doubt before the jury could find him guilty under the two Section 242 charges. It pretermitted the first of those elements when it stated that there was no doubt that Joel Kelly is an inhabitant of a state. The three remaining · elements, as charged by the court, were: (1) that defendants "were acting under color of law," (2) that the conduct of the defendants deprived Joel Kelly of some right secured or protected by the Constitution or laws of the United States, and (3) that "there was an intent on the part of the defendants willfully to subject the alleged victim to the deprivation" of that right.

Since the jury rendered a general verdict of acquittal on the two Section 242 charges, it is impossible to determine whether the jury's acquittals were based on a reasonable doubt that the defendants' conduct deprived Joel Kelly of his right to due process, i.e., to be free from unreasonable, unnecessary or unprovoked assault by those acting under color of law, or a reasonable doubt that defendants acted willfully with intent to subject Kelly to such deprivation.

■■■ Where there is more than one possible reason for the jury's verdict, and the court "without extrasensory perception * * cannot say that any one is necessarily inherent in the verdict," the doctrine of collateral estoppel is inapplicable, and a second prosecution using evidence of acts upon which the defendant has been acquit-

ted is not barred. *United States v. Gonzalez,* 548 F.2d 1185, 1192 (5th Cir.1977).

In the first trial Irvin was acquitted of willfully depriving Joel Kelly of a right secured or protected by the Constitution or laws of the United States. In the second trial, the United States presented evidence of the incidents involving Joel Kelly as overt acts in furtherance of a conspiracy to injure Jerry Johnson in the free exercise of his right not to be deprived of property without due process of law.

 The first jury may well have acquitted defendant of the Section 242 offenses based upon a reasonable doubt as to whether defendant's acts were done with a specific intent to deprive Joel Kelly of his right to due process. However, in the second trial, that was not an element of the government's proof. Regardless of whether the harassment of Joel Kelly involved the specific intent required for conviction under Section 242 or amounted to a deprivation of Kelly's constitutional right to due process, it was the government's theory that that harassment was part of a pattern of incidents occurring shortly after the November, 1982 election which promoted the overall scheme of injury to Jerry Johnson in his business. Proof of those incidents did not require the government to relitigate any fact necessarily found in defendant's favor in the first trial. Thus, the doctrine of collateral estoppel did not bar the United States from introducing evidence of the Kelly incidents as overt acts in furtherance of the Section 241 conspiracy charged in the indictment.

### B. THE DISTRICT COURT DID NOT ERR IN INSTRUCTING THE JURY THAT THE GUILT OR INNOCENCE OF EACH DEFENDANT SHOULD BE CONSIDERED SEPARATELY

 The district court correctly instructed the jury that "each defendant is entitled to a separate consideration of his case." The jury was entitled to find not only that Irvin and Gray had conspired with each other but also that either had

conspired with Sheffield and/or Hawkins, who were also named as conspirators in the indictment but who were acquitted in the previous trial. *United States v. Espinosa-Cerpa,* 630 F.2d 328 (5th Cir.1980); *Standefer v. United States,* 447 U.S. 10, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980).

In *United States v. Smith,* 588 F.2d 111, 117–19 (5th Cir.1979), the court reversed a conviction in which the district court had given an "all or nothing" charge which required the jury to acquit all defendants in this conspiracy case if it had a reasonable doubt about the guilt of any one of them. The court concluded that, by linking the appellant inextricably to his co-defendant against whom the evidence was very strong, the district court essentially assured appellant's conviction. *Smith,* 588 F.2d 118–19. It held that the district court should have "emphasized that the jury should each defendant separately, examining *only* the evidence relating to each individually." *See also United States v. Watson,* 669 F.2d 1374, 1389 (11th Cir. 1982).

Accordingly, the instruction given by the district court here was correct.

### C. THERE WAS NO ABUSE OF DISCRETION IN GRANTING THE GOVERNMENT'S MOTION TO PREVENT IRVIN FROM ATTEMPTING TO PROVE THAT SHEFFIELD AND HAWKINS WERE ACQUITTED OF CONSPIRACY IN THE FIRST TRIAL

 On April 5, 1985, the district court granted the United States' motion in limine to instruct defense counsel to refrain from mentioning, referring to or soliciting information during direct or cross-examination of any witness concerning the acquittals in the previous trial. The court's ruling was correct.

 Judgments of acquittal are hearsay. Unlike judgments of conviction, which may be admitted under Rule 803(22) of the Federal Rules of Evidence for some purposes, and used for impeachment under

Rule 609, judgments of acquittal are not covered by an exception to the rule against admission of hearsay. *Fed.R.Evid.* 801, 802.

In *United States v. Kerley*, 643 F.2d 299, 300–01 (5th Cir.1981), the court held that the trial court did not abuse its discretion in excluding evidence of the defendant's acquittal in state court arising out of the same incident that was the basis of the offense charged in the federal indictment. The court stated that

> [a]lthough a judgment of acquittal is relevant with respect to the issues of double jeopardy and collateral estoppel, "once it is determined that these pleas in bar have been rejected, a judgment of acquittal is not usually admissible to rebut inferences that may be drawn from the evidence that was admitted." *United States v. Viserto*, 596 F.2d 531, 537 (2d Cir.), *cert. denied* 444 U.S. 841, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979).

643 F.2d at 300.

 Even if the evidence of prior acquittal was otherwise admissible, it would be properly excludable under Rule 403, *Fed.R.Evid.*, because its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *Kerley*, 643 F.2d at 301. The district court has broad discretion to exclude such evidence. *United States v. Johnson*, 585 F.2d 119, 125–26 (5th Cir. 1978). That discretion was not abused here.

We AFFIRM.