# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30486

United States Court of Appeals
Fifth Circuit

**FILED**
May 14, 2018

Lyle W. Cayce
Clerk

RICKY LANGLEY,

Petitioner - Appellant

v.

HOWARD PRINCE, WARDEN, ELAYN HUNT CORRECTIONAL CENTER,

Respondent - Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before WIENER, HIGGINSON, and COSTA, Circuit Judges.
STEPHEN A. HIGGINSON, Circuit Judge:

The State of Louisiana tried Ricky Langley three times for the same killing. At the second trial, the jury acquitted Langley of first degree murder, relevantly defined as (1) killing a human being (2) with specific intent to kill or to inflict great bodily harm (3) where the victim was under twelve. *See* La. R.S. 14:30(A)(5). Langley's attorneys had conceded the first and third elements, but disputed the second; they argued that Langley was mentally incapable of forming the requisite intent. Years later, at the third trial, and over a double jeopardy objection, the State re-tried Langley for the lesser included offense of second degree murder, defined as (1) killing a human being (2) with specific intent to kill or to inflict great bodily harm. *See* La. R.S. 14:30.1(A)(1). This time, the

No. 16-30486

State secured a conviction. Langley now petitions for a writ of habeas corpus, arguing that his conviction violated the issue-preclusion component of the Double Jeopardy Clause. *See Ashe v. Swenson*, 397 U.S. 436, 443–46 (1970).

The Double Jeopardy Clause, made applicable to the states by the Fourteenth Amendment, guarantees that "[n]o person shall . . . be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *accord Benton v. Maryland*, 395 U.S. 784, 787 (1969). This language embodies an idea "deeply ingrained" in Anglo-American jurisprudence: "that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense." *Green v. United States*, 355 U.S. 184, 187 (1957). To that end, the Double Jeopardy Clause requires that acquittals be final—no matter how legally or factually erroneous they may appear to be. *E.g.*, *United States v. DiFrancesco*, 449 U.S. 117, 129–30 (1980); *Fong Foo v. United States*, 369 U.S. 141, 143 (1962). Once an acquittal is rendered, the State may not re-prosecute the defendant for the same crime. *E.g.*, *Green*, 355 U.S. at 188. And importantly here, neither may the State prosecute the defendant for even a *different* crime, if that crime has as an essential element an issue necessarily determined by the acquitting jury's verdict. *Ashe*, 397 U.S. at 443–46.

In this case, the verdict from Langley's second trial necessarily determined that the State failed to prove beyond a reasonable doubt that Langley acted with specific intent to kill or to inflict great bodily harm. Hence, the State is constitutionally barred from prosecuting Langley for any crime having that same issue as an essential element. Langley's second-degree-murder conviction from his third trial is therefore invalid. We accordingly REVERSE the district court's dismissal of Langley's habeas petition and REMAND with directions to issue the writ. There may well be crimes for which the State can constitutionally prosecute Langley in connection with the horrific facts of this

2

No. 16-30486

case. But under clearly established Supreme Court precedent, second degree murder as defined in La. R.S. 14:30.1(A)(1) cannot reasonably be one of them.

## I

The facts are heartrending. Six-year-old J.G. went missing on February 7, 1992. Officers soon arrested Langley, who was then twenty-six years old. Once inside the police cruiser, Langley admitted to killing the young boy and leaving the body in his closet. He described how he rented a room from a family with two children; how J.G. came to the house looking to play with one of those children; how Langley followed J.G. inside; and how Langley strangled J.G. to death. He then gave the officers a videotaped tour of the house, recounting the events in a calm and neutral voice that one witness described as having "no register whatsoever of horror, shame, [or] anxiety." When an officer asked Langley why he had done it, Langley shook his head and answered: "I couldn't tell you. I still go through my mind trying to figure it out. It's like, I know I did it, but yet it's like something you read in a newspaper."

Langley later gave two more custodial videotaped confessions. His confessions gave differing stories, however, as to whether he also beckoned J.G. inside the house; as to whether he abused J.G. sexually; and as to whether any such abuse took place before or after the strangling.

## A

The first trial took place in July 1994. A grand jury charged Langley with first degree murder; a petite jury convicted him; and a judge sentenced him to death. Those proceedings were set aside, however, after a finding that the judge presiding over the grand jury had selected the foreperson on the basis of race. *See generally State v. Langley (Langley II)*, 813 So. 2d 356, 359–65, 373 (La. 2002) (applying *Campbell v. Louisiana*, 523 U.S. 392, 396–97 (1998)). Neither party contends that this now-vacated conviction carries double jeopardy consequences. *See generally Burks v. United States*, 437 U.S. 1, 13, 16 (1978).

3

No. 16-30486

B

The second trial—the one most relevant here—took place in May 2003. The State re-indicted Langley on the same first-degree-murder charge, and again sought the death penalty. Langley pleaded not guilty and not guilty by reason of insanity. *See* La. Code Crim. Proc. Ann. art. 552(3).

In arguments to the jury, defense counsel repeatedly emphasized that they were not contesting that Langley had killed J.G. The defense likewise conceded to the jury that J.G. had been under the age of twelve.

Instead, the defense's closing argument contested primarily two issues. First, defense attorney Phyllis Mann argued that the State had failed to prove beyond a reasonable doubt that Langley acted with specific intent to kill or to inflict great bodily harm. The core of the argument was that Langley could not have formed the requisite intent because his mental illness prevented him from understanding and intending the consequences of his actions. Second, defense attorney Clive Smith argued separately that Langley had proved his insanity defense by a preponderance of the evidence. Both arguments turned in part on the same evidence of Langley's mental illness.[1] But Langley's attorneys

---

[1] For example, the jury heard testimony regarding Langley's history of mental breakdowns; his family trauma; and his significant pre-natal exposure to medical drugs, alcohol, and x-rays. (According to evidence adduced at trial, the first five-and-a-half months of Langley's gestation occurred while his mother was hospitalized in a body cast after a car accident, during which time she was administered surgeries and painkillers by doctors who did not realize she was pregnant.) The defense also called medical experts who opined (1) that Langley could have incurred permanent brain damage as a result of his toxic and malformed prenatal environment; (2) that Langley suffered from audio and visual hallucinations and had been diagnosed as "schizophreni[c]"; and (3) that Langley was "acutely psychotic" at the time of the killing and as such was "not mentally able to really develop the intent, the ill will, the desire to harm the other." *Cf.* La. Code Evid. Ann. art. 704 cmt. b (noting that Louisiana has declined to adopt the federal rule of evidence prohibiting expert testimony regarding a criminal defendant's mental state).

were careful to delineate the two theories—explaining that they involved different substantive standards, required different degrees of persuasion, and placed the burden of proof on different parties.

As would become relevant on appeal, the judge presiding over Langley's second trial left the courtroom for significant portions of the proceedings, cut off the defense's closing argument early, refused to entertain certain contemporaneous objections, and by and large "failed to maintain order and decorum" in the courtroom. *See generally State v. Langley (Langley III)*, 896 So. 2d 200, 203–07 (La. Ct. App. 2004).

The judge did, however, give the following jury instructions:

First, the judge defined first degree murder. First degree murder in Louisiana consists of (1) killing a human being (2) with specific intent to kill or to inflict great bodily harm (3) with one or more aggravating factors. *See* La. R.S. 14:30(A). Here, the State chose to rely on two possible aggravators: either (a) that Langley was committing or attempting second degree kidnapping, *see id.* 14:30(A)(1); or (b) that J.G. was less than twelve years old, *see id.* 14:30(A)(5).[2] The judge accordingly defined first degree murder as requiring proof of those elements beyond a reasonable doubt. The judge then defined specific intent:

---

[2] The judge appears to have worked from the statutory definition of first degree murder in effect as of May 2003, which provided in relevant part:

> First degree murder is the <u>killing of a human being</u>:
> (1) When the offender has <u>specific intent to kill or to inflict great bodily harm</u> *and* is engaged in the perpetration or attempted perpetration of aggravated kidnapping, <u>second degree kidnapping</u>, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, drive-by shooting, first degree robbery, simple robbery, or terrorism. . . . [*or*]
> (5) When the offender has the <u>specific intent to kill or to inflict great bodily harm</u> upon a <u>victim who is under the age of twelve</u> or sixty-five years of age or older.

La. R.S. 14:30(A) (May 2003) (emphases added).

No. 16-30486

> Specific criminal intent is that state of mind which exists when the circumstances indicate that a defendant actively desired the prescribed criminal consequences to follow his act or failure to act.

And the judge told the jury: "[I]f you are convinced beyond a reasonable doubt that [Langley] is guilty of first degree murder, your verdict should be 'guilty.'"

Second, the judge instructed the jury, "If you are not convinced that [Langley] is guilty of the offense charged, you may find [him] guilty of a lesser offense," including second degree murder. *See* La. Code Crim. Proc. Ann. art. 804(B). Second degree murder in Louisiana is defined in the alternative. As relevant here, it consists of either: (1) killing a human being (2) with specific intent to kill or inflict great bodily harm ("specific-intent second degree murder"), *see* La. R.S. 14:30.1(A)(1); or (1) killing a human being (2) while committing or attempting certain enumerated felonies ("second degree felony murder"), *see id.* 14:30.1(A)(2).[3] The judge instructed the jury as to both types.[4]

---

[3] The judge again appears to have worked from the 2003 version of the second degree murder statute, which provided in relevant part:

> Second degree murder is the killing of a human being:
> (1) When the offender has a specific intent to kill or to inflict great bodily harm; *or*
> (2) (a) When the offender is engaged in the perpetration or attempted perpetration aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, drive-by shooting, armed robbery, first degree robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
> (b) When the offender is engaged in the perpetration of cruelty to juveniles, even though he has no intent to kill or to inflict great bodily harm.

La. R.S. 14:30.1(A) (2003) (emphases added). As noted below, "second degree kidnapping" and "cruelty to juveniles" were *not* listed in the version of the statute that applied during the alleged commission of the offense in February 1992. *See infra* note 11.

[4] As discussed below, the judge's oral instructions erroneously defined specific-intent second degree murder as the killing of a human being "with *or without* specific intent to kill or to inflict great bodily harm." (emphasis added). *See infra* Part IV–C–2. During deliberations, the jury received a written corrected instruction, with the consent of both parties.

6

No. 16-30486

With respect to specific-intent second degree murder, the judge gave no definition of "specific intent" other than the one quoted above.[5] With respect to second degree felony murder, the judge instructed the jury that the relevant felonies were second degree kidnapping, *see id.* 14:44.1,[6] and cruelty to juveniles, *see id.* 14:93.[7] The judge then told the jury: "If you are not convinced that [Langley] is guilty of first degree murder, but you *are* convinced beyond a reasonable doubt that [he] is guilty of second degree murder, the form of your verdict should be 'guilty of second degree murder.'" (emphasis added).

Finally, the judge instructed the jury on the insanity defense. He explained that "[Langley] has the burden of proving his insanity at the time of the commission of the offense by a preponderance of the evidence." He then defined insanity:

> [Langley was insane at the time of the commission of the offense] if the circumstances indicate that because of his mental disease or mental defect the defendant was incapable of distinguishing between right and wrong with reference to the conduct in question . . . .

---

[5] The State agrees that first degree murder under La. R.S. 14:30(A)(5) and second degree murder under La. R.S. 14:30.1(A)(1) have identical *mens rea* elements. *See* Oral Arg. at 33:36–33:48 ("The specific intent standard is the same in Louisiana law regardless. It's the same instruction."); *see also, e.g.*, *State v. Sepulvado*, 672 So. 2d 158, 165 (La. 1996) (treating the victim's age as an objective element of La. R.S. 14:30(A)(5), rather than as part of the *mens rea*); 17 *Louisiana Civil Law Treatise: Criminal Jury Instructions* § 10:7 (3d ed. updated Nov. 2017) ("The defendant's knowledge of the victim's age is not an element of [La. R.S. 14:30(A)(5)].").

[6] The judge defined "second degree kidnapping" as "the enticing or persuading of any person to go from one place to another when the victim is physically injured or sexually abused." In addition to the issues noted above, Langley's attorneys contested whether J.G. was sexually abused.

[7] The judge defined "cruelty to juveniles" as "the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child." Langley's attorneys conceded to the jury that it could reasonably conclude that Langley committed cruelty to juveniles.

7

No. 16-30486

And he instructed that, if the jury found that the State had proved Langley's guilt beyond a reasonable doubt, but *also* found that Langley established his insanity defense, the verdict "must be 'not guilty by reason of insanity.'"

The verdict form listed the possible responsive verdicts— "guilty," "guilty of second degree murder," "guilty of manslaughter," "not guilty by reason of insanity," and "not guilty"—and instructed the jury to return exactly one of them. *See* La. Code Crim. Proc. Ann. arts. 809, 814(A)(1), 816. During deliberations, the jury requested a written list of elements for each responsive verdict, and a clarification of the phrase "great bodily harm" in the specific-intent requirement. The judge provided the first requested item, but not the second.

The jury returned a verdict finding Langley guilty of second degree murder and, by implication from the verdict form and the judge's instructions, acquitting him of first degree murder.[8]

C

Langley appealed his second-degree-murder conviction, and the Louisiana Third Circuit Court of Appeal reversed and remanded for a new trial. *Langley III*, 896 So. 2d at 212. The Third Circuit first held that the trial judge's misconduct amounted to structural error warranting reversal with no showing of prejudice necessary. *Id.* at 207–10. Then, reasoning that the verdict was "an absolute nullity," the Third Circuit opined that Langley could be re-tried even for first degree murder—notwithstanding his recent acquittal. *Id.* at 210–12.

---

[8] Under Louisiana law (as reflected in the jury's instructions and verdict form), a verdict of "guilty of second degree murder" is the only mechanism by which a jury can acquit a defendant of first degree murder while also convicting him of second degree murder. *See* La. Code Crim. Proc. Ann. arts. 809, 813, 814(A)(1). If the jury had returned a verdict of "not guilty of first degree murder," the judge would have been required to reject it. *Id.* art. 813. Louisiana law further provides that, when a person is charged with first degree murder and convicted of second degree murder, that verdict "is an acquittal" of the first-degree-murder charge. *Id.* art. 598(A).

No. 16-30486

On remand, the defense moved to quash the first degree murder charge, citing *Fong Foo*, 369 U.S. at 143, and *Green*, 355 U.S. at 188–91, on the ground that Langley had just been acquitted of that exact crime. The trial court (this time a new judge) granted the motion, ordering that the re-trial be limited to second degree murder. The State sought interlocutory review, and the Third Circuit summarily reversed.

Granting certiorari, the Louisiana Supreme Court reversed the Third Circuit, reinstated the trial judge's order, and quashed the first degree murder charge. *State v. Langley (Langley IV)*, 958 So. 2d 1160, 1169–70 (La.) (citing *Green*, 355 U.S. at 188), *cert. denied*, 552 U.S. 1007 (2007). The opinion held that Langley's second-degree-murder conviction operated as an implied acquittal of first degree murder. *Id.* at 1170. That was so both because the jury instructions required the jury to acquit on first degree murder before considering second, *see id.* at 1169–70, and because Louisiana law provides that "[w]hen a person is found guilty of a lesser degree of the offense charged, the verdict . . . is an acquittal of all greater offenses charged in the indictment," *id.* at 1170 (quoting La. Code Crim. Proc. Ann. art. 598(A)).

D

The third trial took place in November 2009, with Langley now represented by his present-day counsel. Langley waived his right to a jury and proceeded via bench trial.

On day one of trial, the State orally moved to amend the indictment to reflect that only second degree murder was being charged. Langley's counsel agreed that the indictment should be amended, but also argued that the new indictment must be limited to felony murder—raising the *Ashe* issue for the

9

No. 16-30486

first time.[9] Specifically, Langley's counsel contended (and continues to contend today) that no rational jury could have returned the 2003 verdict without deciding that the State failed to prove beyond a reasonable doubt that Langley had specific intent to kill or to inflict great bodily harm. Thus, Langley's counsel argued, the State could not charge Langley with any crime requiring proof of that same element, including the crime of specific-intent second degree murder under La. R.S. 14:30.1(A)(1). *See Ashe*, 397 U.S. at 443–46. The court granted the State's motion and denied Langley's from the bench.[10] The indictment was formally amended to reflect charges for second degree murder under both La. R.S. 14:30.1(A)(1) (specific intent) and La. R.S. 14:30.1(A)(2) (felony murder).

The next morning, however, the State orally dismissed the felony murder charge, leaving only the charge of second degree murder *based on specific intent*. The prosecutor explained that he had looked at the 1992 code the night before and realized for the first time that the crimes of "second degree kidnapping" and "cruelty to juveniles" were not enumerated felonies in the version of the felony-murder statute in effect at the time of Langley's alleged offense.[11]

---

[9] As explained below, because the Louisiana courts ultimately addressed Langley's *Ashe* claim on the merits, procedural default is not at issue in this case. *See infra* note 39.

[10] The trial judge's reasons for denying Langley's *Ashe* claim provided in full:

> I think I understand what you're suggesting regarding the suggested acquittal by the jury in the last trial of this matter when they chose to convict him on the charge of Second Degree Murder as opposed to First Degree Murder.
>
> My position, however, is that the charge of Second Degree Murder specifically indicates when the offender has a specific intent to kill or inflict great bodily harm. It may well be that the jury convicted him on that, which is inclusive in the First Degree.
>
> That being said, I'm denying your motion at this time.

[11] The 1992 version of second degree felony murder covered only committing or attempting "aggravated rape, forcible rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, first degree robbery, or simple robbery." La. R.S. 14:30.1(A)(2) (1992).

No. 16-30486

The judge ultimately found Langley guilty of second degree murder. The ruling explicitly stated that "[t]he issue of specific intent . . . is necessary for the determination of guilt," and found that the requisite specific intent was present. Langley's counsel renewed the *Ashe* objection in a post-trial motion, but the judge stood by his earlier ruling. The judge then imposed the mandatory sentence of life imprisonment without parole. *See* La. R.S. 14:30.1(B).

E

On direct appeal, the Louisiana Third Circuit Court of Appeal rejected Langley's *Ashe* claim on its merits. *State v. Langley (Langley V)*, 61 So. 3d 747, 757–58 (La. Ct. App. 2011).[12] The Third Circuit reasoned that the 2003 verdict had not "necessarily determined" the issue of specific intent because the jury might have chosen not to obey the judge's instructions. *See id.* The Louisiana Supreme Court declined review, 78 So. 3d 139 (La. 2012) (mem.), as did the United States Supreme Court, 568 U.S. 841 (2012) (mem.).

Less than one year later, Langley pressed his *Ashe* claim in a federal habeas petition. *See* 28 U.S.C. § 2254. A magistrate judge issued a report and recommendation that the petition be denied. *Langley v. Prince (Langley VI)*, No. 13-cv-2780, 2015 WL 10635328 (W.D. La. Dec. 14, 2015). The magistrate judge disavowed the state court's reasoning, substituting her own reasoning instead. *See id.* at \*8. According to the magistrate judge, Langley's *Ashe* claim failed because Langley had not shown that "a rational jury would not find that Langley acted with specific intent to kill." *Id.* The magistrate judge further

---

[12] Before analyzing issue preclusion (also known as collateral estoppel), the Third Circuit noted that Langley's 2009 trial for second degree murder did not implicate the separate body of double jeopardy law relating to re-prosecutions for the same crime following a conviction. *See Langley V*, 61 So. 3d at 757 (citing *State v. Mayeux*, 498 So. 2d 701, 705 (La. 1986)); *see also Burks*, 437 U.S at 13, 16 (explaining that a vacated conviction is not a double jeopardy bar to retrial, unless the conviction was vacated due to insufficiency of the evidence). Langley does not challenge that conclusion, and the State does not argue that it is relevant to the arguments presented here.

reasoned that, because the jury rejected Langley's insanity defense, the jury could not have used evidence of Langley's mental illness to find a lack of specific intent. *Id.* Then, because the magistrate judge could "locate no other grounds within the record . . . to support a finding of no specific intent," she concluded that the issue "was not necessarily determined." *Id.* The district court adopted the report and recommendation in full and dismissed Langley's petition. It did, however, issue a certificate of appealability, permitting our review.

## II

Because the state court rejected Langley's *Ashe* claim on its merits, *see Langley V*, 61 So. 3d at 757–58, Langley is not entitled to federal habeas relief unless that adjudication

> resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1).[13] This standard "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state court proceedings," *Harrington v. Richter*, 562 U.S. 86, 102 (2011)—but it comes close. Review under § 2254(d)(1) must be "highly deferential" to the state court's decision, and must give that decision "the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The district court's application of § 2254(d)(1) is reviewed de novo. *Williams v. Thaler*, 684 F.3d 597, 603 (5th Cir. 2012).

---

[13] The route to habeas in 28 U.S.C. § 2254(d)(2) for state-court adjudications "based on an unreasonable determination of the facts" is inapplicable here. The application of the *Ashe* doctrine turns on no facts other than "the record[s] of . . . prior proceeding[s]," 397 U.S. at 444, which in this case "[t]he parties do not dispute," *Price v. Vincent*, 538 U.S. 634, 639–40 (2003). *See also United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997) (noting that *Ashe* presents a pure question of law).

No. 16-30486

For purposes of § 2254(d)(1), "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). In other words, it includes the applicable Supreme Court holdings, but not "the dicta." *Id.* at 71. Law may be clearly established by the Supreme Court even if the Court has not rendered a decision "on nearly identical facts"; rather, it is enough if Supreme Court holdings clearly establish "a general standard." *Marshall v. Rodgers*, 569 U.S. 58, 62 (2013) (per curiam).

The "contrary to" and "unreasonable application" clauses, moreover, "have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694 (2002). The "contrary to" clause is met "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Id.* The "unreasonable application" clause, in turn, is met "if the state court identifies the correct governing legal rule" but "unreasonably applies it" to the facts of the case, or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Terry Williams v. Taylor*, 529 U.S. 362, 407 (2000).

"[A]n unreasonable application is different from an incorrect one." *Bell*, 535 U.S. at 694. To be an "unreasonable application," the state court's error must have been "well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Richter*, 562 U.S. at 108. And, under our circuit's interpretation of the "unreasonable application" clause, we review only the reasonableness of the state court's "ultimate legal conclusion," as distinct from the thoroughness or quality of its written opinion. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (per curiam).

13

No. 16-30486

Along these lines, our court has stated that review under § 2254(d)(1) encompasses not just the arguments and legal theories the state court's opinion actually gave, but also any arguments or legal theories the state court reasonably *could have* given. *E.g.*, *Evans v. Davis*, 875 F.3d 210, 216 (5th Cir. 2017) (citing *Richter*, 562 U.S. at 102); *Clark v. Thaler*, 673 F.3d 410, 418 (5th Cir. 2012) (same).[14] Langley argues that the Supreme Court unequivocally rejected this approach in *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92, 1194–96 (2018), issued after oral argument in this case.[15] We leave *Wilson*'s impact to be decided another day. Because Langley is entitled to relief even under "*Richter*'s 'could have supported' framework," *id.* at 1195, we assume for the limited purpose of this appeal that, where the state court denies the petitioner's claim by issuing an opinion that rests on objectively unreasonable grounds, § 2254(d)(1) still bars relief unless the petitioner "show[s] there was no reasonable basis for the state court to deny relief," *Richter*, 562 U.S. at 98.

---

[14] *Richter* mandated the "could have supported" framework for cases in which the state court's order denying relief "is unaccompanied by an opinion." 562 U.S. at 98. Our court has understood that same framework to apply even where a state-court opinion exists. *E.g.*, *Evans*, 875 F.3d at 216; *Clark*, 673 F.3d at 418; *see also Santellan v. Cockrell*, 271 F.3d 190, 193–94 (5th Cir. 2001) ("It would be odd to require a less deferential approach to reasonableness in cases where the state courts attempted to articulate reasons for their decisions than in those where they did not."). It is unclear the extent to which our en banc decision in *Neal*—which merely *elaborated* the state court's given justification, as opposed to fashioning a new legal theory from whole cloth—endorses the same "could have supported" approach. *Compare* 286 F.3d at 243, *with id.* at 246–47.

[15] *Wilson* instructed that § 2254(d) "requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected a state prisoner's federal claims.'" 138 S. Ct. at 1191–92 (quoting *Hittson v. Chatman*, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari)). It further explained that, when a state court opinion exists, this inquiry is "straightforward": "a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.* at 1192. And *Wilson* held that "*Richter* does not control . . . where there is a reasoned decision by a lower state court." *Id.* at 1195.

14

No. 16-30486

III

A

The "starting point" for our analysis is to identify the relevant Supreme Court precedent that was clearly established when the state court issued its opinion. *Marshall*, 569 U.S. at 61. Here, that precedent is the Double Jeopardy Clause's issue-preclusion component, as set forth in *Ashe v. Swenson*, 397 U.S. 436, 443–46 (1970), and related cases. The *Ashe* doctrine "precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." *Yeager v. United States*, 557 U.S. 110, 119 (2009).

The challenge, of course, is deciphering exactly which issues (if any) a jury's verdict "necessarily decided." The use of general verdict forms muddies the analysis, as general verdicts say little if anything about the jury's specific rationale. *Brackett*, 113 F.3d at 1398–99. But the Supreme Court in *Ashe* did not leave it to the states to crack this puzzle. Rather, it prescribed a specific solution: When the prior acquittal "was based upon a general verdict, as is usually the case," the reviewing court must

> examine the record of prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude *whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.*

397 U.S. at 444 (emphasis added). In other words, the court must ask whether a rational jury could have returned the same verdict without deciding the relevant factual issue. *See United States v. El-Mezain*, 664 F.3d 467, 552–53 (5th Cir. 2011) (citing *United States v. Leach*, 632 F.2d 1337, 1340 (5th Cir. 1980)). If not, that issue was "necessarily decided."

The facts of *Ashe* are illustrative. A group of masked men robbed six participants in a poker game. 397 U.S. at 437. The state charged Bob Ashe with

15

six separate counts of robbery—one for each player. *Id.* at 438. At Ashe's trial for the robbery of poker player Donald Knight, however, the jury acquitted. *Id.* at 439. The question was whether the state could proceed to try Ashe for the robberies of the other five players.

It could not. After announcing the test described above, the Supreme Court held that the jury had "determined by its verdict that [Ashe] was not one of the robbers." *Id.* at 446. The jury instructions had stated in effect that the jury was required to find Ashe guilty if it found (1) that the alleged robbery had occurred; (2) that the robbers had taken "any money" from Knight; and (3) that Ashe had been one of the robbers, whether or not Ashe had personally taken the money. *See id.* at 439 & nn.2, 3. At trial, the evidence that the alleged robbery took place and that the robbers had taken money from Knight was strong and undisputed. *Id.* at 438. The evidence of the robbers' identities, on the other hand, was weak. *Id.* So the "single rationally conceivable" basis for the jury's acquittal was that the jury was not convinced beyond a reasonable doubt that Ashe had been one of the robbers. *Id.* at 445. As a result, the state could not "hale him before a new jury to litigate that issue again." *Id.* at 446.

*Ashe* and the Supreme Court cases applying it clearly establish the following relevant governing principles:

*First*, the subject of the *Ashe* inquiry is a hypothetical, objective, and rational jury—not the actual jurors in the room. The question is not what these *particular* jurors decided, but rather what a rational jury *could* have decided if faced with the trial record. That, after all, is what *Ashe* literally says. *See* 397 U.S. at 444 (test asks what "a rational jury could have" done); *see also id.* at 445 (issue necessarily decided because it was "[t]he single rationally conceivable issue in dispute"). The Supreme Court has since reiterated that "what transpired in the jury room" is beside the point; the *Ashe* inquiry is "confined to the points in controversy on the former trial, to the testimony given by the

parties, and to the questions submitted to the jury for their consideration." *Yeager*, 557 U.S. at 122 (quoting *Packet Co. v. Sickles*, 72 U.S. (5 Wall.) 580, 593 (1866)); *see also, e.g.*, *United States v. Powell*, 469 U.S. 57, 67 (1984) ("Courts have always resisted inquiring into a jury's thought processes . . . ."); *Garcia v. Dretke*, 388 F.3d 496, 503–04 (5th Cir. 2004) (understanding *Ashe* to clearly establish for purposes of § 2254(d)(1) that "[o]ur inquiry into the potential rationale of the first jury . . . must stay within the bounds of a rational[] inquiry").

*Second*, and as a corollary, *Ashe* is in fact "*predicated* on the assumption that the jury acted rationally." *Powell*, 469 U.S. at 68 (emphasis added). Thus, when the first jury returns "irreconcilably inconsistent" verdicts—meaning verdicts that acquit on one count while convicting on another, where the two counts require opposite resolutions of the same issue of ultimate fact—*Ashe* no longer applies. *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 356–57 (2016) (construing *Powell*, 469 U.S. at 68). But so long as the jury's verdicts are not "on their face . . . logically inconsistent," *Ashe* still controls: the court must "respect . . . the legitimacy" of the verdicts and assume the jury rational. *Yeager*, 557 U.S. at 124–25; *see also id.* at 134 (Alito, J., dissenting) (agreeing that "courts should begin with the presumption that a jury's actions can rationally be reconciled").

*Third*, *Ashe* itself establishes that the court must assume the hypothetical jury believed any "substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest." 397 U.S. at 444 n.9. Otherwise, the Supreme Court explained, issue preclusion would never apply, "since it is impossible to imagine a statutory offense in which the government has to prove only one element or issue to sustain a conviction." *Id.* This principle was essential to *Ashe*'s holding. Without it, the issues whether the robbery occurred at all and whether any money was taken from Knight would have been additional

No. 16-30486

"rationally conceivable issue[s] in dispute" that would have foreclosed relief. *See id.* at 445.

*Fourth* and finally, a court applying *Ashe* must assume that the jury—being a rational one—followed its jury instructions. This principle is implicit in the concept of a rational jury and in the Supreme Court's reasoning in *Ashe*. *See, e.g.*, *United States v. Tran*, 433 F. App'x 227, 231 (5th Cir. 2011) (understanding *Ashe*'s use of the phrase "rational jury" to mean a jury that obeys its instructions). And the Supreme Court made that principle explicit when it decided *Turner v. Arkansas*, 407 U.S. 366 (1972) (per curiam).

In *Turner*, the state had tried Dennis Turner for first degree murder on theories of premeditated murder and felony-murder committed in the course of a robbery. *Id.* at 369. After the jury acquitted on both theories, the state re-indicted him for the robbery itself. *Id.* at 367. Turner argued that the acquittal had necessarily decided that he did not commit the robbery. *Id.* at 368. The state countered that a rational jury could have found that Turner *did* commit the robbery but that he had let his partner do the killing. *Id.* at 369.

The Supreme Court rejected the state's argument as "belied by the actual instructions given the jury." *Id.* Those instructions had stated that "[a]ll persons being present . . . in any felony, shall be deemed principal offenders." *Id.* Thus, the Supreme Court said, "[h]ad the jury found [Turner] present at the crime scene, it would have been obligated to return a verdict of guilty of murder even if he had not actually pulled the trigger." *Id.* "The only logical conclusion," the Court held, "is that the jury found him not present at the scene of the murder and robbery." *Id.* The case was "thus squarely controlled by *Ashe*," necessitating the indictment's dismissal. *Id.* at 370.

Supreme Court precedent, accordingly, clearly establishes that the *Ashe* doctrine incorporates the understanding (ubiquitous in law) that rational juries obey their instructions. *See also, e.g.*, *Powell*, 469 U.S. at 66–67 (jurors

18

generally assumed to follow the law as charged); *Opper v. United States*, 348 U.S. 84, 95 (1954) ("Our theory of trial relies upon the ability of a jury to follow instructions.").

Thus explicated by the Supreme Court, *Ashe* analysis is often not difficult. When the trial record contains multiple disputed factual issues, any subset of which could independently justify the jury's verdict, there can be no issue preclusion. *E.g., Garcia*, 388 F.3d at 501–02 (citing *United States v. Irvin*, 787 F.2d 1506, 1515–16 (11th Cir. 1986)).[16] But in the rare instance in which there is just a "single rationally conceivable issue in dispute before the jury," *Ashe*, 397 U.S. at 444, issue preclusion attaches.[17]

Our opinion in *United States v. Brackett*, 113 F.3d 1396 (5th Cir. 1997), for example, shows just how simple the *Ashe* inquiry can be.[18] George Brackett had been tried for possession of marijuana with intent to distribute. *Id.* at 1397. "At trial, he did not contest the fact that he had been in possession" of marijuana. To the contrary, "the prosecution and the defense both acknowledged that *mens rea* was the only disputed issue for the jury." *Id.* The jury

---

[16] *See, e.g., El-Mezain*, 664 F.3d at 555 (issue not necessarily decided where the jury could have acquitted either because the state failed to prove that the defendant joined the conspiracy, or because the state failed to prove that he did so *willfully*); *United States v. Sarabia*, 661 F.3d 225, 231 (5th Cir. 2011) (issue not necessarily decided where the jury could have acquitted either because the state failed to prove that the defendant was driving the relevant vehicle, or because the state failed to prove that the defendant was a party to the conspiracy); *Garcia*, 388 F.3d at 500 (issue not necessarily decided where the jury could have acquitted either because the state failed to prove that a robbery occurred, or because the state failed to prove that the murder took place during the robbery).

[17] As Justice Alito has noted, *Ashe* "is a demanding standard." *Yeager*, 557 U.S. at 133 (Alito, J., dissenting). "The second trial is not precluded simply because it is unlikely—or even very unlikely—that the original jury acquitted without finding the fact in question. Only if it would have been *irrational* for the jury to acquit without finding that fact is the subsequent trial barred." *Id.* at 133–34; *accord id.* at 126–27 (Kennedy, J., concurring in part and concurring in the judgment).

[18] Although we may not use Fifth Circuit precedent "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme] Court has not announced," *Marshall*, 569 U.S. at 64, we may use circuit cases to illustrate (but not expand upon) principles the Supreme Court has *already* announced.

acquitted. *Id.* Our analysis of what that acquittal "necessarily decided," therefore, was appropriately straightforward. We explained:

> It is not difficult to discern the facts "necessarily decided" by the jury in the first trial. Brackett did not deny that he was in possession of 247 kilograms of marihuana when arrested, nor did he contest the physical evidence and eyewitness testimony. To the contrary, he freely conceded all the facts relevant to the *actus reus* and staked his defense exclusively on the question of *mens rea.*
>
> Insisting that he had no knowledge of the marihuana, Brackett characterized himself as an innocent driver who had been used as an unwitting drug courier by drug smugglers, and the jury apparently believed him. Under these circumstances, *there is only one rational explanation for the general verdict of acquittal*: The government did not prove, beyond a reasonable doubt, that Brackett knew of the 247 kilograms of marihuana in his truck on September 18, 1992. Accordingly, the jury "necessarily decided" . . . that Brackett did not knowingly possess marihuana with intent to distribute on that date.[19]

*Id.* at 1399 (emphasis added). Likewise, in *Green v. Estelle*, 601 F.2d 877 (5th Cir. 1979), a jury acquitted Roy Green of murder "with malice" but convicted him of murder "without malice." *Id.* at 877. The jury instructions permitted that result only if the jury "f[ound] [Green] guilty of murder" while still "hav[ing] reasonable doubt that [he] . . . acted with malice." *Id.* at 878. These verdicts, coupled with *Ashe*'s presupposition of a rational jury, "[necessarily] determined the malice issue in Green's favor." *Id.*; *see also id.* at 878–79 & n.4

---

[19] *Brackett* went on to hold that, although the issue had been "necessarily decided," the issue did not constitute an essential element of the offense charged in the subsequent prosecution. 113 F.3d at 1399–40. It is undisputed in this case that the issue of Langley's specific intent was an essential element of Langley's 2009 prosecution. *See supra* p. 11.

No. 16-30486

(emphasizing that *Ashe* requires the assumption that the jury followed its instructions). As explained below, Langley's *Ashe* claim is similarly straightforward.

B

Here, Langley contends that the 2003 jury verdict necessarily determined that he lacked the specific intent to kill or to inflict great bodily harm at the moment he killed J.G. To resolve his claim, we must consider the record from the 2003 trial and ask: Could a rational jury have returned this same verdict *without* deciding that the State failed to prove beyond a reasonable doubt that Langley had specific intent to kill or to inflict great bodily harm? *See Ashe*, 397 U.S. at 444.[20] Given the above-recited principles of clearly established Supreme Court law, the answer can only be "no." The issue of Langley's specific intent was necessarily decided.

The jury instructions required the jury to return a verdict of "guilty [of first degree murder]" if all four of the following conditions were met:

(1) The jury found beyond a reasonable doubt that Langley killed J.G.;

(2) The jury found beyond a reasonable doubt that J.G. was less than twelve years old;

(3) The jury found beyond a reasonable doubt that Langley acted with specific intent to kill to or inflict great bodily harm; and

(4) The jury failed to find by a preponderance of the evidence that Langley was insane at the time of the offense.

---

[20] It is immaterial that the jury's verdict was formally denominated "guilty of second degree murder," as opposed to "not guilty of first degree murder." *See supra* note 8. It is likewise immaterial that Louisiana law deemed the verdict to be a first-degree-murder acquittal. *See Schiro v. Farley*, 510 U.S. 222, 232 (1994); *cf.* La. Code Crim. Proc. Ann. art. 598(A); *Langley IV*, 958 So. 2d at 1170. Rather, what matters for purposes of *Ashe* is whether, in light of the issues and arguments presented at trial, a rational jury could have returned the verdict without deciding the relevant factual issue. *See Schiro*, 510 U.S. at 236; *Ashe*, 397 U.S. at 444.

21

No. 16-30486

But the jury did *not* return a verdict of "guilty [of first degree murder]." Because *Ashe* requires us to assume that the jury acted rationally and obeyed the judge's instructions, the jury rationally must have failed to make at least one of these four findings.

We know, however, that the jury rationally *did* make findings (1) and (2). Like Brackett, Langley "freely conceded all the facts relevant to the *actus reus*." 113 F.3d at 1399. He confessed to the killing, and his lawyers repeatedly told the jury that they "had never from the very beginning even suggested that [Langley] was not the cause of [J.G.]'s death." Nor could there have been any doubt that the victim was under twelve. The defense repeatedly acknowledged to the jury that J.G. was six years old when he died. Under *Ashe*, therefore, the court must assume that a rational jury would have found these two elements established beyond a reasonable doubt. *See* 397 U.S. at 444 n.9.

We also know the jury rationally must have fulfilled condition (4). We know this because the jury instructions stated that, if the jury found by a preponderance of the evidence that Langley was insane at the relevant time, the jury was required to return a verdict of "not guilty by reason of insanity." But the jury did not return such a verdict. So, again, given our assumption that the jury acted rationally, and given that a rational jury obeys both the rules of logic and the judge's instructions, the jury rationally could not have based its verdict on Langley's putative insanity defense.

"The only logical conclusion," *Turner*, 407 U.S. at 369, is that the jury failed to make finding (3)—that is, failed to find beyond a reasonable doubt that Langley acted with specific intent to kill or to inflict great bodily harm. Any other result would be irrational or contravene the judge's instructions.[21]

---

[21] Nothing about this result contradicts the jury's verdict finding Langley guilty of second degree murder. As the trial judge explained, second degree murder can be satisfied on a felony murder theory, "even though [the defendant] has no intent to kill or to inflict great

22

No. 16-30486

*Ashe*'s test is therefore satisfied: "[no] rational jury could have grounded its verdict upon an issue other than" that of Langley's specific intent. 397 U.S. at 444. As in *Ashe*, therefore, the Double Jeopardy Clause prohibits the State from "hal[ing]" Langley into court "to litigate that issue again." *Id.* at 446. Because that is what the State proceeded to do, *see supra* p. 11, Langley's 2009 conviction was unconstitutional under any reasonable application of the Supreme Court's clearly established principles of the *Ashe v. Swenson* doctrine.

Langley is therefore entitled to federal habeas relief.

IV

The state court's opinion, the federal magistrate judge's opinion, and the State's arguments on appeal all purport to articulate reasonable grounds on which the state court could have based its denial of Langley's *Ashe* claim. But because we have just deemed Langley's conviction invalid under *any* reasonable application of *Ashe*, it follows that these proffered, conflicting rationales must themselves be contrary or unreasonable under the § 2254(d)(1) standard. Our analysis could end here. Nonetheless, out of an abundance of caution, we pause to confirm that none of the proffered rationales could have "otherwise justif[ied] the state court's result." *Richter*, 562 U.S. at 102.[22]

A

The state court rejected Langley's *Ashe* claim because, although it regarded insufficient evidence of intent as *one* possible basis for the jury's verdict, it could imagine two other possibilities, as well. *See Langley V*, 61 So. 3d at 757. The first additional possibility was "that the jury convicted the defendant

---

bodily harm." La. R.S. 14:30.1(A)(2); *see also supra* notes 6 & 7 (noting that neither of the relevant felonies had specific intent as a necessary element).

[22] As noted above, we assume for purposes of this opinion that *Richter*'s "could have supported" framework applies to this case, notwithstanding that the state court issued a reasoned opinion. *See supra* p. 14; *see also Wilson*, 138 S. Ct. at 1194–95 (criticizing the "could have supported" approach for being inefficient).

No. 16-30486

of specific intent second degree murder" under La. R.S. 14:30.1(A)(1). *Id.* The second additional possibility was "that, given the nature of the case, the verdict was, in fact, a compromise verdict." *Id.* Neither possibility is reasonably valid under *Ashe.*[23]

1

To start, it was objectively unreasonable for the state court to conclude that a rational jury could have "convicted [Langley] of specific intent second degree murder" in light of Langley's concessions. Like in *Turner*, that theory "is belied by the actual instructions given the jury." 407 U.S. at 369. As explained above, the trial judge instructed that the verdict "should be 'guilty [of first degree murder]'" if the jury rejected Langley's insanity defense and found beyond a reasonable doubt that (1) Langley killed J.G., (2) Langley had specific intent to kill or inflict great bodily harm, and (3) J.G. was under twelve. *See* La. R.S. 14:30(A)(5). A rational jury, however, *must* have rejected the insanity defense (given that it failed to return an insanity verdict), and *must* have found

---

[23] The state court's *Ashe* analysis provided in full:

> When a lesser included offense to the crime charged is returned by a jury it is not always possible to determine why that verdict was reached. It is possible that the jury convicted the defendant of specific intent second degree murder. It is possible that the jury verdict was based on a jury finding under the felony-murder rule, and the jury determined there was no specific intent to kill. It is equally plausible that, given the nature of the case, the verdict was, in fact, a compromise verdict. Regardless of the jury's thought process in this particular case, clearly the argument that the issue of specific intent was "necessarily determined" is unsupported.

*Langley V*, 61 So. 3d at 757–58. Given the state court's reference to "the jury's thought process in this particular case," it is arguably ambiguous whether the state court failed to heed *Ashe*'s explicit holding, i.e., failed to ask "whether a rational jury could have grounded its verdict upon an issue other than" that of Langley's specific intent. 397 U.S. at 444. Nonetheless, because we give the state court's decision "the benefit of the doubt," *Pinholster*, 563 U.S. at 181, we assume the state court was attempting to describe the possible grounds on which a rational jury could have based the verdict.

24

No. 16-30486

that Langley killed J.G. and that J.G. was under twelve (the uncontested is-
sues). *See Ashe*, 397 U.S. at 444 & n.9. Thus, if the jury had found that Langley
had specific intent to kill or to inflict great bodily harm—as the state court
suggested the jury rationally might have done—the jury "would have been ob-
ligated to return a verdict of guilty of [*first* degree] murder," not second.
*Turner*, 407 U.S. at 369. So no rational jury could have taken the path the state
court's opinion proposes.[24]

2

It was also objectively unreasonable for the state court to conclude that
a rational jury could have returned a "compromise verdict"—that is, could have
based its verdict not on the judge's instructions, but on the jurors' negotiated
preferences as to the proper outcome in the case.[25] This possibility, too, contra-
venes the clearly established rule that, under the *Ashe* doctrine, rational juries
are assumed to follow the law as instructed. *See, e.g.*, *Turner*, 407 U.S. at 369.

In fact, as early as 1979, our court held that the Supreme Court in *Ashe*
"[c]learly . . . intended" that the risk of jury nullification in the form of a "mercy
verdict" could not justify denying an *Ashe v. Swenson* claim. *See Green*, 601
F.2d at 878–79 & n.4 (holding that acquittal of murder "with malice," paired
with simultaneous conviction for murder "without malice," necessarily decided
the issue of the defendant's intent). As we then explained, the assertion that
the jury's verdict could have resulted from the exercise of mercy, as opposed to

---

[24] We do not read the state court's opinion to assert that a rational jury could have
convicted Langley of specific-intent second degree murder "without ever deliberating" on
whether Langley was guilty of first degree murder. *See Schiro*, 510 U.S. at 234. The State's
briefs never make such an argument—and for good reason. The judge's instructions were
clear that the jury could not convict Langley of second degree murder without first rejecting
the first degree murder charge. *See supra* Part I–B.

[25] *See Compromise Verdict*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A verdict
reached when jurors, to avoid a deadlock, concede some issues so that other issues will be
resolved as they want.").

the judge's instructions, "could be made about any ultimate issue of fact decided by a jury." *Id.* If that possibility sufficed to defeat an *Ashe* claim, we said, no court "could []ever apply the principle of [issue preclusion]," even on the facts of *Ashe* itself. *Id.* at 878–79 & n.4. We thus held:

> Clearly, this is not what the Supreme Court intended when it held that the principle [of issue preclusion] is a part of the Double Jeopardy Clause. *We must take the jury at its word*, and in this case, its word shows that in the first murder trial it decided the issue of malice in [the defendant's] favor.

*Id.* at 879 (citation omitted) (emphasis added). Our cases repeatedly have reiterated this holding.[26] Other circuits unanimously agree.[27]

---

[26] *See Tran*, 433 F. App'x at 231 ("[I]f we consider jury nullification as a basis on which the jury might have acquitted . . . , we would in effect be eliminating the entire doctrine of [issue preclusion] . . . ." (quoting *United States v. Leach*, 632 F.2d 1337, 1341 n.12 (5th Cir. 1980))); *Neal v. Cain*, 141 F.3d 207, 211 (5th Cir. 1998) ("That [the defendant] was convicted on the lesser-included offense . . . seems to represent a compromise between those members of the jury favoring conviction and those favoring acquittal. Nevertheless, our task is to make legal sense of the jury's verdict."); *De La Rosa v. Lynaugh*, 817 F.2d 259, 267–68 (5th Cir. 1987) ("Although in our concept of double jeopardy the law must recognize that a jury can act in an irrational manner—even to the point of ignoring the law or the Judge's instructions in a blend of undecipherable mercy—we must proceed on the basis that the jury in the first trial acted in a legally correct manner. Otherwise, the ultimate issue of fact decided by any jury could be second guessed and we could never apply the principle of [issue preclusion].").

[27] *See, e.g.*, *United States v. Brown*, 983 F.2d 201, 202–03 (11th Cir. 1993) ("We also deem it essential in th[e] [*Ashe*] inquiry to apply the well-recognized presumption that a jury follows its instructions. While the possibility of jury nullification may influence the strategy of trial lawyers, it cannot enter into the analysis of courts making [issue preclusion] inquiries. The presumption that juries follow their instructions is necessary to any meaningful search for the reason behind a jury verdict." (citations omitted)); *United States v. Seley*, 957 F.2d 717, 723 (9th Cir. 1992) ("If we approached every acquittal suspecting that the jury may have nullified, acquittals could never be said to settle questions of ultimate fact, and *Ashe* would mean nothing at all."); *United States v. Mespoulede*, 597 F.2d 329, 333 n.7 (2d Cir. 1979) ("[T]he Government suggests that the jury may have compromised, and hence what was actually decided can never be known. But this assertion is made in the teeth of clear case law that the possibility that the jury acquitted out of a desire to compromise or to show mercy, or from 'simple frustration after hours of tedious debate,' is not a basis for refusing to apply [issue preclusion]. A contrary rule would, of course, eviscerate the doctrine altogether, for no one who is not present during the jury's deliberations can ever know precisely how the jury reached its verdict." (citations omitted)).

No. 16-30486

These circuit-level cases, of course, cannot themselves establish that this principle was "clearly established Federal law, as determined by the Supreme Court"; *Ashe* and *Turner* are necessary (and sufficient) to do that. *See supra* pp. 18–19 (explaining that *Ashe* and *Turner* clearly established that rational juries obey their instructions). These cases merely confirm that *Ashe* and *Turner* are understood to mean what they said: that the *Ashe* doctrine presupposes a rational jury, and presupposes that rational juries return verdicts based on the facts and the law. We hold that this law was clearly established by the Supreme Court in *Ashe* and *Turner* well before the state court issued its 2011 opinion, and we further hold that the state court's disregard for this law constituted an objectively unreasonable application of *Ashe*.

B

The district court adopted in full the magistrate judge's opinion, which rejected Langley's *Ashe* claim for different reasons. *See Langley VI*, 2015 WL 10635328, at *8–9. Unlike the state court, the magistrate judge correctly refused to consider the possibility of "'mistake, compromise, or lenity' on the part of the jury." *Id.* at *8 (quoting *Powell*, 469 U.S. at 65). Instead, the magistrate judge went on to provide her own, independent analysis as to why Langley's

27

No. 16-30486

*Ashe* claim fails. *See id.* at \*8–9.[28] That analysis, too, failed reasonably to apply clearly established Supreme Court precedent.[29]

1

The central problem with the magistrate judge's reasoning is that it asked the wrong question. As explained (at length) above, *Ashe* requires courts to determine whether it is rationally possible for the jury to have yielded the verdict it did without deciding the relevant factual issue. *See, e.g.*, 397 U.S. at 444; *El-Mezain*, 664 F.3d at 552–53. The magistrate judge's opinion, however, failed to undertake that analysis. Instead, it appears to have asked a wholly different question: whether sufficient evidence existed to justify *acquitting*

---

[28] The magistrate judge's analysis stated in full:

> After choking [J.G.], Langley strangled him and then forced a sock down his mouth and well into his throat. He confessed to this manner of killing on at least four separate occasions, three of which were played for the jury at trial and corroborated by the physical evidence. Additionally, the jury was specifically instructed that intent could be inferred from the circumstances and that individuals were presumed to intend the natural consequences of their actions. "Sturdier threads are needed," therefore, to support a finding that a rational jury would not find that Langley acted with specific intent to kill. *United States v. Dray*, 901 F.2d 1132, 1140 (1st Cir. 1990).
>
> The defense based its refutation of specific intent squarely and solely within Langley's alleged insanity. It contended that he could not have intended to kill [J.G.] because his mental illness prevented him from distinguishing right from wrong. However, the jury failed to find Langley not guilty by reason of insanity. Under the insanity instruction used at trial, then, the jury must have failed to find that Langley was incapable of distinguishing right from wrong. Therefore it could not have used this same element to find that he lacked specific intent.
>
> We can locate no other grounds within the record of the second trial to support a finding of no specific intent. Accordingly we find that the issue was not necessarily determined in Langley's favor during the second trial.

*Langley VI*, 2015 WL 10635328, at \*8–9.

[29] Again, we need not address Langley's argument that the magistrate judge erred out of the gate by failing to "review[] the specific reasons given by the state court and defer[] to those reasons if they are reasonable." *Wilson*, 138 S. Ct. at 1192; *see supra* p. 14.

No. 16-30486

Langley of first degree murder. In other words, the magistrate judge sat as a thirteenth juror, evaluated for herself the strength of the evidence, and concluded that any rational jury would have found Langley guilty of first degree murder. The magistrate judge then used her disagreement with the verdict as a basis for depriving the jury's acquittal of double jeopardy effect. *See Langley VI*, 2015 WL 10635328, at *8–9 (rejecting Langley's *Ashe c*laim because, disregarding the substantial evidence of Langley's mental illness which the magistrate judge refused to consider, "no . . . grounds . . . support a finding of no specific intent").[30] In short, instead of performing an *Ashe* analysis of the kind prescribed by the Supreme Court, the magistrate judge appears to have assessed whether the Louisiana prosecutors were entitled to judgment as a matter of law. *Cf.* Fed. R. Civ. P. 50(a).

Not only did the magistrate judge fail to apply the test mandated by *Ashe*, the test it *did* apply cannot be reconciled with "[p]erhaps the most fundamental rule in the history of double jeopardy jurisprudence": the rule that an acquittal—even one based on egregious legal or factual error—is absolutely conclusive. *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) (citing *United States v. Ball*, 163 U.S. 662, 671 (1896)); *accord, e.g.*, *DiFrancesco*, 449 U.S. at 129–30; *Fong Foo*, 369 U.S. at 143; *Green*, 355 U.S. at 188. If the Double Jeopardy Clause means anything, it means that the government, having failed to persuade one factfinder, is constitutionally prohibited from attempting "a second bite at the apple." *Burks*, 437 U.S. at 16; *see also, e.g.*, *Green*, 355 U.S. at 187–88. And double jeopardy issue preclusion "is constitutionally no different." *Ashe*, 397 U.S. at 446. As the Supreme Court's *Ashe* cases

---

[30] The magistrate judge refused to consider evidence of Langley's mental illness for reasons that are independently flawed, as discussed below.

29

have explained: "A jury's verdict of acquittal represents the community's collective judgment regarding all the evidence and arguments presented to it. Even if the verdict is 'based upon an egregiously erroneous foundation,' its finality is unassailable." *Yeager*, 557 U.S. at 122–23 (quoting *Fong Foo*, 369 U.S. at 143); *accord Powell*, 469 U.S. at 67; *Ashe*, 397 U.S. at 446. This clearly established finality doctrine leaves no room for courts "to second-guess the soundness of [the jury's] verdict." *Yeager*, 557 U.S. at 125.

There is, of course, an exception to the *Ashe* rule, applicable only if the jury returns verdicts that are "on their face . . . logically inconsistent." *Yeager*, 557 U.S. at 125 (construing *Powell*, 469 U.S. at 68); *accord Bravo-Fernandez*, 137 S. Ct. at 356–57, 359–60 (same). But no one has ever argued that this exception applies here.[31] Indeed, it does not: there is no inconsistency in finding that, although Langley killed J.G. while committing or attempting the crimes of second degree kidnapping or cruelty to juveniles, his mental illness prevented him from forming the specific intent to kill or to inflict great bodily harm.[32] Given such findings, the judge's instructions would have compelled a rational jury to acquit on first degree murder, *see* La. R.S. 14:30(A)(1), (5), but to convict on second degree murder, *see id.* 14:30.1(A)(2). That is what Langley's defense attorneys asked the jury to do. And it is what the jury did. So Langley, like Ashe, is entitled to constitutional protection: "Once a jury had determined upon conflicting testimony that there was at least a reasonable doubt that [Langley had the requisite specific intent], the State could not present the same or different . . . evidence in a second prosecution . . . in the hope

---

[31] *See, e.g.*, Oral Arg. at 22:49–23:50 (confirming that the State does not contend that this case falls within the *Powell* exception to *Ashe*).

[32] As noted earlier, the jury was instructed that neither second degree kidnapping nor cruelty to juveniles has as an essential element specific intent to kill or to inflict great bodily harm. *See supra* notes 6 & 7.

No. 16-30486

that a different [factfinder] might find that evidence more convincing." *Ashe*, 397 U.S. at 446.

Because the magistrate judge failed to apply the rule of decision mandated by *Ashe*, and instead applied a novel interpretation of the Double Jeopardy Clause that contradicts Supreme Court holdings, the magistrate judge's opinion, adopted in full by the district court, was "contrary to" clearly established Supreme Court precedent. *See Bell*, 535 U.S. at 694. The opinion thus cannot supply a reasonable basis for "the state court's result." *Richter*, 562 U.S. at 102.

2

Even accepting the magistrate judge's erroneous view that an acquittal is undeserving of double jeopardy effect unless supported by affirmative evidence, that standard is still met here. The magistrate judge concluded otherwise only because it unreasonably refused to consider the evidence of Langley's mental illness—thereby ignoring Langley's entire case-in-chief, which the jury was within its rights to credit.

The magistrate judge began from the premise that Langley's trial counsel based their arguments regarding specific intent and insanity on the same factual contention: that Langley was suffering from severe mental illness at the time he killed J.G.[33] *See Langley VI*, 2015 WL 10635328 at *8. The magistrate judge then reasoned that, because the jury rejected Langley's insanity defense, it must also have rejected the defense's theory that mental illness prevented Langley from forming the requisite intent. *See id.*

---

[33] Evidence of Langley's mental illness rationally can bear on both his insanity defense and the element of *mens rea. See Clark v. Arizona*, 548 U.S. 735, 767–68 (2006). Langley's defense counsel argued as much at the 2003 trial, and the jury was not instructed otherwise. *See supra* Part I–B.

But this reasoning suffers from at least two independent errors of logic. For one, it erroneously conflates the standards for specific intent and insanity. Per the jury instructions, Langley had the requisite specific intent if he "actively desired the prescribed criminal consequences to follow his act or failure to act." By contrast, the instructions deemed him "insane" if "because of his mental disease or mental defect [he] was incapable of distinguishing between right and wrong with respect to the conduct in question." These standards are distinct. It would not have been irrational for the jury to find that Langley's mental illness was of a kind that, for example, left him not in control of his actions but still preserved his sense of right and wrong. In such a case, Langley would have been unable to stop himself from killing J.G. despite not actively desiring it (i.e., despite having no specific intent), and despite knowing that it was wrong (i.e., despite not being insane). The magistrate judge was wrong to consider such a finding logically impossible.

The magistrate judge's reasoning also overlooks that specific intent and insanity are subject to different standards of proof. Per the jury instructions, the State had to prove specific intent beyond a reasonable doubt, but Langley merely had to prove insanity by a preponderance of the evidence. Thus, for example, there would be nothing inconsistent about a jury (1) finding by a preponderance of the evidence that Langley's mental illness impaired neither his ability to form specific intent nor his ability to distinguish right from wrong (leading the jury to reject the insanity defense); and (2) simultaneously failing to make the same finding *beyond a reasonable doubt* (leading the jury to acquit for insufficient evidence of intent). This error is "well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Richter*, 562 U.S. at 108; *see, e.g.*, *Dowling v. United States*, 493 U.S. 342, 348–49 (1990) (explaining in the course of an *Ashe* analysis that "a jury might reasonably conclude [by a preponderance of the evidence] that Dowling was the

No. 16-30486

masked man who entered Henry's home, even if it did not believe [the same fact] beyond a reasonable doubt"). So not only did the magistrate judge apply a test that was "contrary to" *Ashe*, it applied that test in an unreasonable manner, as well. *See* 28 U.S.C. § 2254(d)(1). For this reason, too, the magistrate judge's opinion is not a barrier to Langley's habeas relief.

C

The State puts forward additional arguments it says "could have supported the state court's decision." *Richter*, 562 U.S. at 102. Some of these arguments merely reiterate the state court and magistrate judge opinions, and to that extent need not be re-examined here.[34] But the State also offers its own, new justifications that, if reasonably correct, would foreclose relief. *See supra* p. 14. None of the State's arguments meets that standard.

1

The State's first argument addresses the jurors' subjective mindsets. The State cites the 2003 trial judge's description of his post-trial, off-record, *ex parte* communications with the jurors, some of whom apparently told him "that the death penalty would be inappropriate." This evidence, the State suggests, "corroborate[s]" its theory that the jurors acquitted Langley not because the State failed to carry its burden of proof with respect to specific intent, but rather because the jury "did not want to impose the death penalty." Appellee Br. at 11–12.

---

[34] For example, the State asserts in conclusory fashion that "the jury [rationally] could have found the petitioner guilty of specific intent second degree murder, which would have been consistent with the jury instructions," Appellee Br. at 13; and that "due to the overwhelming evidence against the petitioner, it is impossible and unthinkable that a rational jury would not have found specific intent," *id.* at 11. These contentions are addressed respectively in Parts IV–A–1 and IV–B above.

No. 16-30486

Whatever the accuracy of the State's proposed factual inference,[35] it cannot defeat an *Ashe* claim because it has nothing to do with *Ashe*. As already explained, *Ashe* clearly establishes that the inquiry is objective. The question is not why *these* jurors returned the verdict that they did, but rather "whether a rational jury could have grounded its verdict upon an issue other than" that of Langley's specific intent. 397 U.S. at 444–45; *accord, e.g.*, *Yeager*, 557 U.S. at 122 & n.6; *Powell*, 469 U.S. at 66–67. So any post-trial statements from these jurors regarding their own subjective decisionmaking are beside the point. *Cf. Yeager*, 557 U.S. at 121 ("[A] jury speaks only through its verdict."). If a court were to accept the State's invitation to consider these jurors' subjective motivations instead of undertaking the rational-jury inquiry mandated by *Ashe*, that court would be "appl[ying] a rule different from the governing law set forth in [the *Ashe* line of] cases." *Bell*, 535 U.S. at 694.

2

The State next emphasizes "that the jury in the [2003] trial was instructed that second degree murder could be with or without specific intent." Appellee Br. at 12. Reading this argument charitably, we take the State to be referring to a misstatement the judge made during the oral jury instructions. In defining specific-intent second degree murder under La. R.S. 14:30.1(A)(1),

---

[35] The jurors' hearsay comments may not be as conclusive as the State asserts. After all, the death penalty would equally be "inappropriate" if the State had failed to prove the elements of first degree murder, the only capital crime at issue. The judge's statements, moreover, are similarly equivocal. By the judge's own account, he "never questioned the jury" or "ask[ed] them why they came back with second [degree murder]." Rather, he "assum[ed]" that "since everybody had almost agreed that the death penalty would be inappropriate in this case[,] they just avoided the sentencing hearing and did what they did." He then added:

> Now, they may have done that because they felt that two or three more days of testimony would be burdensome on them, or [because they] thought that why hear any more, we've heard enough in this case. *I don't know, I'm not gonna second guess them. I didn't probe into it . . . .* (emphasis added).

Of course, the ultimate factual resolution of why *this* jury acted the way it did is immaterial, as explained above.

the judge said the crime could be committed "with *or without* specific intent to kill or inflict great bodily harm" (emphasis added), effectively deleting the *mens rea* requirement.[36] If the jury caught the judge's slip and took the instructions literally, it would have been required to find Langley guilty of second degree murder based solely on the concession that Langley caused J.G.'s death.[37]

Even so, we fail to see how the judge's instructional error could reasonably be held to affect whether the jury's verdict "necessarily determined" the specific-intent issue. That *Ashe* analysis turns on the jury's failure to convict Langley of *first* degree murder—a crime the instructions consistently defined as requiring proof of specific intent. Because Langley's specific intent was the only disputed issue relevant to first degree murder under La. R.S. 14:30(A)(5), and because the jury failed to convict Langley of that crime, the only reasonable conclusion is that the issue of specific intent was "necessarily determined." *See supra* Part III–B. The erroneous instruction for specific-intent second degree murder just does not enter the picture.

---

[36] It is not obvious whether the State intends to rely on the instructional error, or intends simply to rehash the (already-rejected) argument that a rational jury could have convicted Langley of specific-intent second degree murder. The State's argument on this point reads in full:

> Additionally, it is important to remember that the jury in the second trial was instructed that second degree murder could be with or without specific intent. Thus, based on the instructions received, the jury could have found the petitioner guilty of second degree murder with specific intent. The petitioner cannot claim that the issue was "necessarily decided" in his favor, when the presence of specific intent was included in both instructions.

Appellee Br. at 12.

[37] The judge's error came to light during jury deliberations when the jurors requested a written list of elements for each possible responsive verdict. The parties quickly consented to a written, corrected instruction, which was then delivered to the jury. Because we conclude below that the erroneous instruction would be immaterial to Langley's *Ashe* claim even if it had never been corrected, we need not consider Langley's assertion, made at oral argument, that the Supreme Court's *Ashe* holdings clearly establish that the correction obviated the original error's effect.

No. 16-30486

3

The State next accuses Langley of an unduly "rigid reading of the law." Appellee Br. at 13–14. Granting him relief, the State says, would contravene the admonition in *Ashe* that:

> [The *Ashe* doctrine] is not to be applied with the hyper-technical and archaic approach of a 19th century pleading book, but with realism and rationality. . . . The inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the pro-ceedings." Any test more technically restrictive would, of course, simply amount to a rejection of the rule of [issue preclusion] in criminal proceedings . . . .

397 U.S. at 444 (quoting *Sealfon v. United States*, 332 U.S. 575, 579 (1948)).

It is difficult to know what the State understands this passage in *Ashe* to mean. By its own terms, the passage operates only to make issue preclusion more *available*—as opposed to "more technically restrictive." It reminds courts not to reject *Ashe* claims for overly technical reasons. *See also Sealfon*, 332 U.S. at 579 (finding issue preclusion notwithstanding the government's cramped reading of what was technically before the jury). In any event, our disposition of Langley's appeal never relies on the above-quoted language from *Ashe*, and never rejects potential arguments supporting the state court's decision on the grounds that those arguments are too "technical" or "unrealistic."

To the extent the State means to argue that this passage somehow pre-cludes us from applying basic rules of logic in assessing Langley's *Ashe* claim, that argument is untenable. *See, e.g., Turner*, 407 U.S. at 369 (using "logical" inferences to determine "what issues a general verdict of acquittal at the mur-der trial resolved"). Even in § 2254(d) cases, our *Ashe* analysis "must stay within the bounds of a rational[] inquiry." *Garcia*, 388 F.3d at 504.

36

No. 16-30486

4

The State further asserts that Langley has *no* double jeopardy rights stemming from his 2003 trial because, according to the State, that trial "was declared a structural nullity." Appellee Br. at 14. True, the Louisiana Third Circuit Court of Appeal stated in *Langley III* that the procedural errors in the 2003 trial rendered the verdict "an absolute nullity," and on that basis opined that the State could re-prosecute Langley even for first degree capital murder. *See* 896 So. 2d at 210–12. But that holding was objectively inconsistent with clearly established federal law, *see, e.g., Fong Foo*, 369 U.S. at 143; *Green*, 355 U.S. at 189–90, and it was in any event overruled by the Louisiana Supreme Court, *see Langley IV*, 958 So. 2d at 1170. Nothing in *Langley III* provides a reasonable basis for rejecting Langley's *Ashe* claim.

Relatedly, the State observes that "[t]he Louisiana Supreme Court held [in *Langley IV*] that double jeopardy barred [Langley's] retrial for first degree murder, not second degree murder, and based its decision on federal constitutional law." Appellee Br. at 14. That sentence is true in part. As explained above, after the 2003 trial, the State attempted to re-prosecute Langley for first degree murder. *See supra* Part I–C. The Louisiana Supreme Court held that it could not, on the ground that Langley had already been acquitted of that crime. *See Langley IV*, 958 So. 2d at 1169–70 (applying state law and arguably federal law as well). The Louisiana Supreme Court also stated that its holding did not prevent the State from re-prosecuting Langley for second degree murder as a general matter. *See id.* at 1170–71.[38] But the Louisiana Supreme Court did not consider the separate question whether, under the Double Jeopardy Clause's

---

[38] To be clear, the same is true of our opinion: Nothing we say today prevents the State from re-prosecuting Langley for second degree murder under La. R.S. 14:30.1—or for any other crime—on a theory that does not have as an essential element proof of Langley's specific intent to kill or harm.

No. 16-30486

issue preclusion component as defined in *Ashe*, the 2003 verdict necessarily determined that Langley lacked specific intent to kill or inflict great bodily harm. Indeed, Langley did not raise that argument until his present-day counsel began to represent him on remand from *Langley IV*.[39]

We therefore fail to see the relevance of *Langley IV* to the present case. The Louisiana Supreme Court's silence with respect to a federal constitutional claim not raised by the parties before it says nothing about whether the Louisiana Third Circuit Court of Appeal reasonably rejected that claim on the merits four years later in *Langley V*. This observation by the State has no bearing on Langley's habeas petition.

5

At oral argument, the State relied primarily on a new argument not developed in its brief. *See* Oral Arg. at 18:38–21:58, 24:58–28:05, 34:01–34:26. According to the State, because Langley's counsel at the 2003 trial "never conceded second degree kidnapping," *id.* at 19:09–19:11, "there was still a valid first degree murder charge" using the second-degree-kidnapping aggravator in La. R.S. 14:30(A)(1), *id.* at 20:51–20:58. Thus, the State's argument seems to go, the jury rationally could have acquitted Langley of first degree murder based on a failure to prove second degree kidnapping, rather than a failure to prove specific intent.

---

[39] We note again that the Louisiana Third Circuit Court of Appeal explicitly addressed Langley's *Ashe* claim on the merits. *See Langley V*, 61 So. 3d at 757–58. For that reason, the State was correct to acknowledge in district court that "[t]he doctrine of procedural default is not a bar to federal habeas review of this case." *See also Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) ("If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might otherwise have been available."); *Langley VI*, 2015 WL 10635328, at *7 ("In addressing the merits of the claim now renewed in his federal habeas petition, the Louisiana Third Circuit Court of Appeal noted no procedural defects and denied the claim on the merits. Therefore we find no grounds for procedural default.").

This argument fails as a matter of logic. It is of course true that if the State failed to convince the jury that Langley was committing or attempting second degree kidnapping, the jury was obligated to reject the prosecution's first-degree-murder theory under La. R.S. 14:30(A)(1). But as described above, the State proceeded on two *alternative* first-degree-murder theories: *either* that Langley was committing or attempting second degree kidnapping, *see* La. R.S. 14:30(A)(1); *or* that J.G. was under twelve years old, *see id.* 14:30(A)(5). Proof of either theory would have necessitated a first-degree-murder conviction. Because the jury did *not* convict Langley of first degree murder, it rationally must have rejected both theories. And the "single rationally conceivable issue in dispute" with respect to the theory based on La. R.S. 14:30(A)(5) was whether the State proved beyond a reasonable doubt that Langley acted with specific intent to kill or to inflict great bodily harm. *Ashe*, 397 U.S. at 445; *see supra* Part III–B. So the issue of Langley's specific intent was "necessarily decided," the State's arguments notwithstanding.

## D

Finally, having rejected the arguments put forth by the state court, the magistrate judge, and the State's attorneys, we come to the question whether we ourselves can "imagine any possible reasonable analysis [under *Ashe*] that could support the state appeals court's decision." *Evans*, 875 F.3d at 217 n.4 (quoting *Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012)).

It is not our usual practice to craft arguments for the parties or to conjure legal theories no litigant or jurist has raised. *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) (explaining that "our adversary system . . . rel[ies] on the parties to frame the issues for decision and assign[s] to courts the role of neutral arbiter of matters the parties present"); *Day v. McDonough*,

No. 16-30486

547 U.S. 198, 210 (2006) (confirming that federal habeas courts "surely have no obligation to assist attorneys representing the State").[40]

Nevertheless, we take this opportunity to report that our own independent analysis of this tragic case, several times reversibly mishandled by state judges, *see generally supra* Part I, has revealed no reasonable application of the *Ashe* doctrine the state court could have used to reject Langley's claim. We can only conclude that Langley has demonstrated that his case satisfies the criteria set forth in § 2254(d)(1), allowing the writ to issue. "Although we do not relish adding a new chapter to this [terribly] unfortunate story," the federal habeas statute and the Double Jeopardy Clause "afford[] [Langley] a right to relief." *Reed v. Quarterman*, 555 F.3d 364, 382 (5th Cir. 2009).

V

The State of Louisiana is constitutionally prohibited from charging Langley with any crime having as an essential element proof beyond a reasonable doubt of Langley's specific intent to kill or to inflict great bodily harm at the moment he killed J.G. Nothing we say today prevents the State from charging Langley with crimes that do not have such proof as an essential element. Langley's 2009 conviction for specific-intent second degree murder under La. R.S. 14:30.1(A)(1), however, cannot stand.

The district court's judgment is REVERSED, and this case is REMANDED with instructions to grant Langley's petition for a writ of habeas corpus and to take any further appropriate action.

---

[40] We also note that not a single current member of the United States Supreme Court considers this step a necessary component of the § 2254(d)(1) inquiry, to the extent this step is permissible in the present circumstances at all. *Compare Wilson*, 138 S. Ct. at 1191–92 (requiring federal habeas courts reviewing a state court opinion to "simply review[] the specific reasons given by the state court"), *with id.* at 1199 (Gorsuch, J., dissenting) (agreeing that "a federal court generally isn't required to imagine or hypothesize arguments that neither the parties before it nor any lower court has presented" (emphasis omitted)).